# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | **INDICTMENT NO.** |
| **v.** | **:** | **5:18-CR-48** |
| | **:** | |
| **THOMAS H. SACHY,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

---
### MOTION FOR RECONSIDERATION OF
### DETENTION ORDER
---

Following this Court's decision, granting the Government's Motion for

Detention of Dr. Thomas Sachy, this Court agreed to consider Defendant's request

for reconsideration of the Order and possible reopening of the evidence, given the

significance of the Court's decision to hold Dr. Sachy in custody pending his trial

which—noting the the nature of the case and timelines in similar cases in the

Middle District—could mean that he remain in jail for possibly as much as two

years from now before he has the opportunity to defend himself.    The defense

moves this Court to reconsider its Order and grant an evidentiary hearing so that

Defendant can present the evidence necessary for this Court to have a full and fair

determination of the issues upon which the Detention Order relies. In support of

this Motion, Defendant shows this Court the following:

A.   <u>Procedural History</u>:

Dr. Thomas Sachy was indicted, in a sealed indictment, on June 13, 2018. On June 26, 2018, a search warrant and arrest were executed and Dr. Sachy, his fiancé, his 79 year old mother, and his medical assistant, were arrested while his home, his mother's home, and his office were searched and numerous items were seized by the Government. The Government also seized vehicles and froze fourteen bank accounts belonging to him, his family, and his businesses.   Dr. Sachy had his initial appearance and attorney Johnny Pannell stood with him as counsel. The Government filed a Motion for Detention and the hearing was set for Friday, June 29. Immediately thereafter, Dr. Sachy's family contacted undersigned counsel who made arrangements to meet with Dr. Sachy at the Butts County Jail. Counsel was soon-after retained and by agreement, the Detention Hearing was postponed to Monday, July 2, 2018.   No evidence was provided to defense counsel until their arrival at the hearing on Monday, July 2, at 2:30 p.m.   At the hearing, the Government presented the testimony of Officer Ken Morrow, and through him, tendered four documents into evidence.   The defense presented evidence to rebut the presumption of detention by tendering nine documents and proffering important facts relating to the factors set forth in 18 USC § 3142.

This Court held that the defense had sufficiently rebutted the presumption in favor of detention; however, found that no condition or set of conditions could be

imposed upon Dr. Sachy to ensure the safety of the witnesses in the case or to reasonably assure this Court that Dr. Sachy would not flee.    The Order was predicated upon three categories of evidence:    (1) testimony by Officer Morrow that five firearms were discovered at Dr. Sachy's medical office, (2) discovery of a digital folder on the hard drive of Dr. Sachy's computer that contained images gathered from public social media of the two agents/officers leading the investigation against Dr. Sachy, which images also contained members of their families and one of their homes, accompanied by a home address (which the officer believed had been obtained through a "paid" subscription to an information service), and (3) testimony by Officer Morrow that Dr. Sachy was believed to have been held in contempt in his divorce proceedings for secreting away nearly a million dollars of cash.

Following the ruling from the bench, defense counsel sought a reconsideration from the Court and asked to present additional evidence to rebut or explain the facts upon which the Court relied in issuing the Detention Order.    This Court agreed to hear from the parties within seven days concerning this reconsideration request.

B. The Law:

18 U.S.C. § 3142(f) provides, in part, as follows regarding detention hearings:

3

The hearing may be reopened, before or after a determination

by the judicial officer, at any time before trial if the judicial officer

finds that information exists that was not known to the movant at

the time of the hearing and that has a material bearing on the issue

whether there are conditions of release that will reasonably assure

the appearance of such person as required and the safety of any

other person and the community.

Furthermore, a "district court has sound discretion whether to alter or amend a

judgment pursuant to a motion for reconsideration, and its decision will only be

reversed if it abused that discretion."   *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d

949, 957 (11th Cir.2009); see also *Cummings v. Dep't of Corr.*, 757 F.3d 1228,

1234 (11th Cir. 2014).

Defense counsel have identified and gathered numerous pieces of

information, that they did not know (until after the Government presented its case)

existed and would be material to the issue of detention.   The rationale behind the

provision set forth in Section (f) of 18 U.S.C. § 3142, allowing for reopening of a

detention determination, is predicated upon the overarching concerns over due

process in this critical proceeding.   While the bail and detention statutes of the

United States Code do not prohibit the Government from presenting evidence to

the United States Magistrate Judge ***without any notice*** to the defense of that

4

evidence, that practice calls into question the fairness of such a proceeding and, certainly, the fairness of an Order of Detention predicated upon a proceeding in which the defense has practically no way to prepare to defend or explain evidence that it sees for the very first time, as the Judge is about to take the bench.

Imagine if the Government's evidence of flight-risk or danger to the community was a claim that Defendant had engaged in some nefarious event--an act that Defendant adamantly denied having committed--and his best evidence of that denial was a sound and indisputable alibi. If the defense only discovers for the first time *at the hearing* that the Government intended to present evidence of that dangerous event and erroneously attribute it to the defendant, defense counsel would be unable to defend and would necessarily be denied the due process that our Constitution affords to him.   Dr. Sachy and his attorneys now suffer from the same constitutional infirmity—we had no idea what evidence the Government intended to rely upon at the Detention Hearing; therefore, we had no concrete way to defend against it other than to try to proffer possible explanations.   But counsel set to work as soon as the hearing was over to gather the evidence that, we hope, will persuade this Court to reconsider its ruling.   As a result, all of this evidence is, necessarily, "newly-discovered," as we had no idea we needed to "discover" anything more than what we presented at the Detention Hearing until the Government unveiled its proof.

5

C.   <u>Evidence to Correct the Record Upon Which this Court Relied in Issuing the</u>

<u>Detention Order and/or Evidence to Rebut the Inferences the Court Has</u>

<u>Drawn from the Government's Proof:</u>

      a.    **A folder, labeled "Thugs" and containing Facebook photographs**

          **of the two investigating officers and their families, along with**

          **home address information, was discovered on the hard drive of**

          **Dr. Sachy's computer, leading the Court to infer that Dr. Sachy**

          **poses a threat to harm or intimidate those witnesses.**

The Government tendered Government's Exhibit 2 ("G2"), which was

identified by Officer Morrow as "files, pictures of me, information of my address,

my family members, another officer that works on our unit, photographs of his

house and his family members" that was located on the hard drive that they had

seized from Dr. Sachy's office [Detention Hearing Transcript of Officer Ken

Morrow's Testimony, hereafter referred to as "DH," p. 19-20].   The questioning

regarding G2 went, as follows:

Q:   And you mentioned that there was there information about family members,

      as well as the law enforcement officers, was there information about their

      families including minors?

A:   There were.   It appears that Dr. Sachy paid for an information service to get

      home addresses and phone numbers.

Q:      Were there pictures of anyone's children –

A:      Yes.

Q:      -- on the investigative team included?

A:      Yes.

[DH, p. 21].

On cross-examination, Officer Morrow agreed that "some" of the photographs were from Facebook but that it "appears that" Dr. Sachy paid for an "information service" to get "home addresses and phone numbers" [DH, p. 21].

After the Detention Hearing, defense counsel interviewed Matthew Casper, a long-time patient of Dr. Sachy's. Undersigned counsel states in her place that Mr. Casper would testify that about a year ago, he began having trouble filling his prescriptions.   Mr. Casper's pharmacist of over thirty-years told Mr. Casper that "the DEA" told him that he would be "audited" if he were to fill a prescription of Dr. Sachy's.   The DEA agent—the pharmacist reported—told the pharmacist that Dr. Sachy was a "quack," that he was running a "pill mill," and that he was "going down."   The conversation disturbed Mr. Casper because he trusted Dr. Sachy and believed that Dr. Sachy was a good doctor and that the DEA was unfairly sullying his doctor's good name.

At his next appointment with Dr. Sachy, Mr. Casper told Dr. Sachy what he had heard.   Dr. Sachy told Mr. Casper that he had become aware, through other

patients, of the terrible things that the DEA was saying about him.    Dr. Sachy

showed Mr. Casper a folder he had put together on his computer which included

Facebook photos of the agents he believed were investigating him. Dr. Sachy's

reference to the folder was one of **incredulity**; not violence or intimidation.

Shaking his head, Mr. Casper reports, Dr. Sachy told Mr. Casper—"how's that for

hypocrisy: coming down on my prescribing medication to pain-ridden patients

when he's got a beer or cocktail in his hand in every picture!" And, "here's the

Government's top-notch investigators: Do you believe I just went online and found

all of this personal information with just a few clicks?"

Dr. Sachy labeled the folder "Thugs," because that's what he believed these

agents to be. Vocabulary.com defines a "thug" as a person who would rather

intimidate than talk.    It was his personal characterization of the people who were

bad-mouthing him to his patients and other professionals, debasing his practice,

and ignoring his civil attempts to have them sit down and discuss with him what

they believed was wrong with his prescribing practices.

And, in fact, it does only take a keystroke to get access to the personal

information that (we guess, since it's nearly impossible to discern from the

thumbnail images on G2) is shown on Government's Exhibit 2.    The tax

assessor's office website requires only that you enter a person's name, hit "enter,"

and a photograph of the person's home, the street address, the specs on the house,

8

the value, and purchaser, all liens, and much more information instantly appears. With one free click.   And while the photographs depicted in G2 do include some family members of the two investigating officers, they only appear in photographs that were posted and publically available on Facebook and in which the subject of the photo—the investigator—<u>also</u> appeared.

But, most significantly, the presence of the folder on Dr. Sachy's computer does not support the inference that he poses any danger to the individuals in those photographs.   There is absolutely no evidence that Dr. Sachy took any action or engaged in any behavior designed to threaten, harm, intimidate, surveille, harass, or even annoy anyone in this case.   No testimony that Dr. Sachy was anywhere near their homes, their families' workplaces or schools, no notes or emails were sent, nothing whatsoever to suggest that the photographs were gathered for any purpose other than, as Matthew Casper reported to defense counsel, to "look at the people who were looking at him."   Without even the tiniest step towards an action designed to intimidate, frighten, or harass anyone involved in this investigation, the inference the Court has drawn from the presence of this folder on Dr. Sachy's computer is not a valid one and certainly should not be used as the basis for a decision to leave a man in custody for years until his day in court.

**b.      There were five firearms discovered at Dr. Sachy's clinic, leading the Court to infer that Dr. Sachy intended those weapons to be used in an offensive manner.**

Officer Morrow was asked whether there were any firearms located at the medical office [DH, p.16-17].   He responded that they found five: one in Dr. Sachy's desk; one in a satchel they presumed belonged to Dr. Sachy; one in Evelyn's purse; one in Brandy's purse; and one in a cabinet within reach of the receptionist [DH, p.17].   The Government asked Officer Morrow whether the firearms they located were consistent with what they had found in searches of a "trap house," or "drug house" like a street drug dealer [DH, p.17].   Officer Morrow responded, "absolutely." [DH, p.17].

Officer Morrow concluded that the only inference to be drawn from the presence of weapons in Dr. Sachy's clinic was the nefarious one--that he had the weapons for the same purpose that "street drug dealers" have weapons: to guard their drugs and shoot people who try to take their drugs.    But this inference is preposterous when there was **no pharmacy**; therefore, no means of dispensing pills; therefore, no ***drugs*** to guard.   Officer Morrow and the Government argued to this Court that the only reason Dr. Sachy could have had those firearms was for an offensive purpose.   A simple records check with the local police department, however, would have revealed something completely different.

10

On October 16, 2017, the Gray Police Department responded to a call to 247 Lana Drive—the location of Georgia Pain and Behavioral Medicine.   A copy of this incident report is attached to this Motion as Exhibit 1.   The call came from Evelyne Ennis who called for help to deal with complaints that a man was in the lobby of the clinic and outside in the parking lot, approaching patients asking to purchase pills from them.   When police arrived, they interviewed two of the patients who had made the complaints.   Based upon the reports, Tho Duc Le (who was still in the parking lot of the clinic) was arrested for criminal attempt to violate the Georgia Controlled Substances Act.   The Indictment and Guilty Plea are attached to this Motion as Exhibit 2.   When Le's truck was inventoried, the police located in his vehicle two automatic pistols—a .9 mm and a .380 Ruger.   Neither weapon was registered to Le.   The guns were taken and later forfeited to the State of Georgia.   A copy of the Forfeiture Order is attached as Exhibit 3.

Additionally, in response to an Open Records Act request filed immediately after this hearing, the Gray Police Department provided defense counsel with two additional incident reports concerning assistance that Dr. Sachy sought in 2011, asking for removal of a former patient who had been discharged from the clinic but continued to return in a disorderly manner.   A copy of these reports are attached to this Motion as Exhibit 4.

11

As Mr. Hogue argued at the Detention Hearing, treating psychiatric patients, alone, may present good cause to keep a weapon handy for possibly defense against an individual suffering from severe mental illness.    Yet in Dr. Sachy's case, the threat from drug-seeking patients was also quite real.    Dr. Sachy had every reason to feel it necessary to safeguard his clinic and its staff after discovering that an individual armed with two unregistered weapons had come on to the property of his medical clinic, harassed and frightened his patients, and necessitated a call to the police.

There were no drugs at Georgia Pain and Behavioral Medicine so the "trap house" inference makes no sense.    To stretch the nefarious inference of the presence of guns at the clinic to suggest that they bore some connection to the presence of photographs and information about the investigating officers is unwarranted and simply not grounded in the reality of this case.    Dr. Sachy had guns at his clinic because, first, it is legal to do so, and, second, because of the nature of his practice.    But once the Tho Duc Le incident took place, the need to be armed became even more necessary.    And justified.    Suggesting that these guns were present in order for Dr. Sachy to offensively harm anyone entering his clinic is not supported by any rational inference to be drawn from the evidence.

The fact is, Dr. Sachy *knew* that the DEA was questioning his patients and advising pharmacists not to fill the prescriptions he was writing.    And Dr. Sachy

had an attorney repeatedly contact those investigators in an attempt, first, to get

them to sit down with Dr. Sachy to explain to him what they believed he was doing

wrong, and for him to explain to them why he made the prescribing decisions that

he did.    But the investigators ignored these requests.    And when the DEA

eventually did come to see Dr. Sachy, it was with an arrest and search warrant.

They entered the building without incident.    No one drew a gun.    No one

threatened the officers. No one even reached for any of the five weapons that were

at the clinic because those weapons were not there to fight off a raid by the police;

they were there to defend the doctor and his staff against mentally ill patients or

armed interlopers seeking to commit a crime against Dr. Sachy, his patients, or his

staff.

> **c.    Dr. Sachy was believed to have been held in contempt in his
> divorce proceedings for secreting away nearly a million dollars of
> cash and is suspected of having additional resources, leading to
> the inference that he is a flight risk.**

Officer Ken Morrow testified that a $980,000 payment that Dr. Sachy was

supposed to be paying to his ex-wife had been put in a bank account in Canada

"and then was – I don't know the exact details, but from what I understand that

money was lost at some point and the Judge instructed him to produce it and he

failed to produce it and he was arrested." [DH, p. 26].    These "details" come

straight out of a newspaper article, commenting on Dr. Sachy's contempt hearing. The actual event is set forth in the pleadings and order related to *Melissa A. Sims v. Thomas H. Sachy*, Civil Action No. 09-CV-215, Jones County Superior Court. Judge William Prior found that Dr. Sachy was in "willful contempt of this Court for failure to pay a Court ordered Judgment in the amount of $930,000." [Jan. 28, 2010, Hearing, p. 99]. Judge Prior made no finding that Dr. Sachy transferred "substantial assets to a foreign jurisdiction in an effort to evade court orders," as this Court has relied upon as one basis to order Dr. Sachy's detention.   And, as testified to at the Detention Hearing, Dr. Sachy <u>did</u> purge himself of this contempt by paying nearly a million dollars to the Court in 2010.

D.    <u>Conclusion</u>

        We know and respect that this Court takes a Detention Order very seriously. We ask for the Court's reconsideration of this Order because the Court was constrained to rely upon virtually uncontradicted testimony of the investigating officer which defense counsel is now able to show was, in some respects, not accurate, and in many respects, does not lead to the inference that the Government argued and upon which this Court based the Detention Order.   Dr. Sachy's money has been frozen, his DEA Registration number surrendered, and his passport seized. He has known, for over a year, that the DEA was investigating his medical prescribing practices yet he made no attempt to flee, no attempt to move money,

14

and certainly no attempt to intimidate, harass, or frighten any of the investigating officers. Any number of conditions could be imposed upon his release, such as home confinement with a GPS monitoring system, to assure this Court that all potential witnesses will be free from harm and that Dr. Sachy will return to court to vigorously defend against these charges.

DATED this 9th day of July, 2018.

s/ Laura D. Hogue
LAURA D. HOGUE
Georgia State Bar No. 360030
Attorney for Defendant
Hogue & Hogue, LLP
341 Third Street
P. O. Box 1795
Macon, GA 31202-1795
(478) 750-8040
laura@hogueandhogue.com

**Certificate of Service**

I certify by my signature that I have served a copy of **Motion for Reconsideration of Detention Order** upon C. Shanelle Booker, Assistant United States Attorney, by electronic filing which will automatically send email notification of such filing to:

C. Shanelle Booker
Assistant United States Attorney
Middle District of Georgia
P.O. Box 1702
Macon, GA 31202

DATED this 9th day of July, 2018.

s/ Laura D. Hogue
LAURA D. HOGUE

16