```
1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF GEORGIA
2                          MACON DIVISION

3               _____

4    THE UNITED STATES OF AMERICA  :  Case No. 5:18-CR-48(TES)-CHW

5              VS.                  :         July 26, 2018

6    THOMAS H. SACHY                :        Macon, Georgia
                          Defendant
7    _____

8

9                     TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE CHARLES H. WEIGLE,
10                UNITED STATES COURT MAGISTRATE JUDGE

11

12   APPEARANCES:

13   FOR THE GOVERMENT:        SHANELLE BOOKER, AUSA
                               UNITED STATES ATTORNEY'S OFFICE
14                             P. O. BOX 1702
                               MACON, GA 31202-1702
15

16   FOR THE DEFENDANT:        FRANK HOGUE
                               LAURA HOGUE
17                             HOGUE, HOGUE, FITZGERALD & GRIFFIN
                               341 THIRD STREET
18                             MACON, GA 31201

19

20

21

22   _____

23                   TAMMY W. DIROCCO, USCR
                         P.O. BOX 539
24                   MACON, GA 31202-0539
                        (478-752-3497)
25
```

1                              WITNESS INDEX

2                                                          Page

3    KEN MORROW

4         Direct Examination By Ms. Hogue .................9

5         Cross Examination By Ms. Booker ...............22

6         Redirect Examination By Mr. Hogue ..............39

7    PAMELA WILLIAMSON

8         Direct Examination By Ms. Hogue ...............44

9         Cross Examination By Ms. Booker ...............48

10   MARY STREET LOGAN

11        Direct Examination By Ms. Hogue ...............50

12        Cross Examination By Ms. Booker ...............57

13   KIRSTIN JENNIFER KEY

14        Direct Examination By Ms. Hogue  ..............60

15

16

17

18

19

20

21

22

23

24

25

```
1                    DEFENDANT'S EXHIBITS

2    NUMBER                DESCRIPTION                PAGE

3    Def. 5    Photograph of reception area .............16

4    Def. 7    2010 Motion for Contempt .................72

5    Def. 8    Articles on Financial Crisis .............72

6    Def. 9    Affidavit of Jeffrey Barnes ..............72

7    Def. 10   2010 Consent Order Jones Co. .............72

8                    GOVERNMENT'S EXHIBITS

9    NUMBER                DESCRIPTION                PAGE

10   Gov. 9    Photographs of 5 guns ....................24

11   Gov. 5    5 pages/photographs of children ..........26

12   Gov. 6    Screen shots of personal information .....28

13   Gov. 7    Three photographs from Sachy's hard ......32

14             drive

15   Gov. 8    6 pages of photographs ...................34

16

17

18

19

20

21

22

23

24

25
```

1  July 26, 2018

2  10:00 a.m.

3          THE COURT:  Today is July 26, 2018.  We are here

4  this morning in case 5:18-cr-48 in the matter of United States

5  versus Thomas H. Sachy.

6          This is a continuation of our hearing on

7  government's motion for detention.  Of course the parties have

8  filed written motions.  I have reviewed both of those and I do

9  understand and appreciate the government's argument that under

10  the statute reopening a hearing is normally something that's

11  only done when there is new evidence that wasn't available at

12  the time of the hearing.  Nevertheless I'm not convinced that

13  there is, but I thought that it an abundance of caution I

14  would prefer to give the defendant the opportunity to be heard

15  further.  Of course, I talked about that at our previous

16  hearing.

17          So I am going to hear further from the defense here.

18  And what I propose is to let the defense go first since -- I

19  won't say who has the burden here, but I've already entered my

20  order and you're asking me to reconsider it.  So, unless the

21  government has any objection to that I would probably like to

22  hear from the defense first.

23          Ms. Booker?

24          MS. BOOKER:  I don't have an objection to the

25  defense going first but I do have an objection to the fact

1   that we are reopening the evidence for the reasons that were

2   stated in my brief.  Your Honor, the filing that Dr. Sachy

3   filed there was nothing new that was not known to the Court at

4   the time of the hearing -- that was not known to Dr. Sachy at

5   the time of the hearing.  And I will make note that Your Honor

6   took a couple of breaks wherein if they were considering this

7   information they could have called Your Honor back to the

8   bench prior to you making your ruling and place whatever

9   additional evidence that they cited in their brief at that

10  time, but they chose not to do it.

11          So, I believe that the government met its burden,

12  followed all of the procedures outlined in 3142(f) and

13  3142(g).  And now that Your Honor has made its ruling the

14  defense is getting a second bite of the apple when the proper

15  procedure is to file an appeal with the District Court which

16  is what should be done here, Your Honor.

17          THE COURT:  Well, I understand that argument.  Of

18  course, it's the argument you made in your brief, as well, and

19  I did review that.

20          But nevertheless I do want to give the defense the

21  opportunity to present whatever evidence they have today.  So

22  I will overrule that objection.

23          MR. HOGUE:  Your Honor, before we begin my law

24  partner, Ms. Hogue, is going to take the lead in this hearing.

25          But would you stand briefly.  (directing Dr. Sachy)

1    Would you ask the courtroom security if they could remove the

2    handcuffs so that Dr. Sachy can participate in the hearing

3    with note taking rather than whispering in my ear.  I would

4    prefer my clients to be able to write their notes and he would

5    like to participate but he can't do it with his handcuffs like

6    this.

7                THE COURT:  What's the government's position on

8    that?

9                MS. BOOKER:  I think that is more of a court safety

10   issue.  I don't want to step in as to what court security and

11   the Marshals usually have for their inmates, but if he wants

12   to write that's fine with me, but if court security feels like

13   it's an issue I will leave that in their discretion, Your

14   Honor.

15               THE COURT:  Well, I talked to the Marshals service

16   about that issue before coming in here.  They mentioned to me

17   that you had raised that concern.  I know it's ordinarily a

18   policy of the Marshals service to -- in these proceedings for

19   security reasons -- to keep the defendants in restraints.

20   Generally I don't like to interfere with the security policies

21   of the Marshals service.  We don't have a jury here.  I'm not

22   so much concerned about the prejudice issues about the

23   restraints, but I am going to allow Dr. Sachy to have the

24   handcuffs removed.

25               MR. HOGUE:  Thank you, Your Honor.

1           MS. HOGUE:  While all that's going on, Your Honor,

2    do you mind if I pull this back?  Does it move?

3           THE COURT:  I don't know if you can.  It's kinda

4    rooted by the microphone there.

5           MS. HOGUE:  I will adjust.

6           THE COURT:  This courtroom is not as nice as the old

7    one and we're getting a little echo up here.

8           I know the podium is -- I'm more comfortable with

9    the podium too, so I certainly appreciate that.  But I would

10   ask that you make sure the microphone is kind of oriented

11   towards you so the court reporter can get everything in the

12   recording.

13          MS. HOGUE:  I'm rarely not heard.  So you let me

14   know.

15          Are you ready for us to begin?

16          THE COURT:  Yeah.

17          MS. HOGUE:  I appreciate the opportunity, Your

18   Honor, to correct the record and shed light on some of the

19   facts that were presented in the initial motion in support of

20   the government's detention requests.

21          And I appreciate the opportunity in hopes of

22   persuading you that Dr. Sachy does not pose a danger to any

23   member of the community and he is not a flight risk and that

24   therefore there are conditions or combinations of conditions,

25   pursuant to the statute, that will assure the Court that

1   Dr. Sachy will not flee and that he will not harass,

2   intimidate or harm anyone in the community.

3          I will try to keep the presentation of evidence

4   pretty much in line with the four factors that the Court

5   relied upon, the factual basis for your decision to order

6   detention.

7          Obviously the ten year plus felony is an

8   uncontroverted fact, it's been indicted and we'll now proceed

9   to the factual basis.

10         The firearms, the digital file regarding

11  investigators, and the general category of Dr. Sachy's

12  finances, and the issue of the investment in Calgary.

13         So to begin I would want to -- just to make sure

14  that the record is sound, I want to tender the four exhibits

15  that are 1, 2, 3, 4 in the motion to reconsider.

16         MS. BOOKER:  That's fine.

17         MS. HOGUE:  And they are marked 1, 2, 3, 4 just as

18  they are in the motion to reconsider.  And those are the

19  incident reports relating to the individual who was arrested

20  in 2017 outside of the clinic, Dr. Sachy's clinic, after

21  reports had been made that this individual was harassing and

22  intimidating patients by trying to buy their meds.

23         The way that the clinic responded was to immediately

24  call in law enforcement.  Law enforcement interviewed those

25  witnesses who identified this individual, Mr. Duck, as someone

1    who had been trying to buy their pills and they had refused.

2            When they arrested Mr. Duck they found in his truck

3    two unregistered firearms, which was terrifying obviously to

4    all of the folks who were at the scene.  And there are three

5    reports, the seizure of those firearms, and the incident

6    report concerning the event.

7            And then Exhibit Number 4 is a summary and a

8    narrative of an incident in which the police were called

9    another time about a patient who had become assertive,

10   aggressive, and intimidating to the staff when she had been

11   told that she was not entitled to more medication and

12   Dr. Sachy refused to prescribe for her and she was asked to

13   leave.

14           Next, Your Honor, I called Ken Morrow to the stand.

15           COURTROOM DEPUTY:  Do you solemnly swear that the

16   testimony you're about to give is the truth, the whole truth,

17   and nothing but the truth, so help you God?

18           THE WITNESS:  I do.

19                          KEN MORROW

20           Whereupon, witness having been duly sworn,

21                       testified as follows:

22                       DIRECT EXAMINATION

23   BY MS. HOGUE:

24       Q   Officer Morrow, I want to orient you to the topic

25   that we're on right now, the five firearms that you testified

1    were found in various places at the clinic at the day of the

2    seizure, the search and seizure.  And I want to ask you a few

3    questions about those.

4         No one at the clinic was a convicted felon?

5         A    No, ma'am.

6         Q    And there are guns that have certain characteristics

7    that make them illegal in and of themselves; is that right?

8         A    Yes, ma'am.

9         Q    The kind of gun that they are, say an automatic

10   weapon, illegal in and of itself?

11        A    Yes.

12        Q    And there are guns that can be illegal because of

13   additions or subtractions made to them making them smaller or

14   modifying them in some way?

15        A    True.

16        Q    There are guns that can have things stuck on them

17   like bump stocks that are either now or soon will be illegal?

18        A    Yes.

19        Q    None of the guns you found were illegal in and of

20   themselves?

21        A    No, ma'am.

22        Q    And when you were involved in this case, Officer

23   Morrow, you were the lead investigator?

24        A    Yes, ma'am.

25        Q    You had other investigators working with you on the

1  case?

2      A    Yes.

3      Q    And other officers and law enforcement officers

4  working for you in the case?

5      A    No, ma'am.  Our group was the only people working

6  this case.  There were no other agencies working for us.

7      Q    You have people that are at your same level -- I

8  mean, or you would say, he and I are the coinvestigators on

9  this case, and then there are people that are lower in rank in

10 your agency; is that right?  And also do some work on these

11 cases?

12     A    Our group at the DEA is set up with special agents

13 and task force officers.  We all have various responsibilities

14 in what we do with the cases.  But by and large I would

15 consider us all relatively equal with the exception of special

16 agents are employed directly by the DEA and task force

17 officers are assigned to the DEA.

18     Q    So as the lead investigator -- because everybody

19 when you have a group, even if you're all of the same rank

20 working together, somebody's going to be the lead.  I'm the

21 lead in this hearing today.  Is that fair enough to say?

22     A    (No verbal response).

23     Q    So as the lead it's your responsibility to gather

24 the records of all of the officers involved in the case?

25     A    I make sure that they are put in our database.

1      Q    And you review those to incorporate them into your

2  own findings?

3      A    By and large, yes.  I will say I have not reviewed

4  every single document in this case.  Most of them, yes.

5      Q    If there were a report that ran counter to the

6  theory in your case you would expect an officer to bring that

7  to your attention and say, "You need to take a look at this

8  one.  This is something that is changing the direction of this

9  case."

10     A    I would hope that would be the case, yes, ma'am.

11     Q    And you keep records.  You maintain reports.  You

12  identify the work that you do by writing it down or typing it?

13     A    Yes, ma'am.

14     Q    You try to do those records close in time to the

15  event that you are reporting?

16     A    Yes, ma'am.

17     Q    You interview a witness and you want to get that

18  information down while it's still fresh?

19     A    When possible, absolutely.

20     Q    And you expect that of the other agents that were

21  working on the case too?

22     A    I would hope they would do that, yes, ma'am.

23     Q    Then after you've got it all done you then make a

24  copy of it and you give it to the prosecutor in this case.  In

25  this instance, Ms. Booker?

1        A     We would batch it, yes, ma'am.  We wouldn't give

2   them piece by piece.  But probably within six months or so we

3   would bring over something for her to review, yes.

4        Q     And you do that before she presents a case to the

5   grand jury?

6        A     By and large, yes.  Ms. Booker has not seen every

7   report at this time, no.

8        Q     But the information upon which the grand jurors

9   needed to rely came from you to Ms. Booker and then from Ms.

10  Booker to the grand jury?

11       A     I believe so.

12       Q     You do the same thing with a search and seizure of

13  items.  You document what happens during a search, the

14  execution of a search warrant?

15       A     Yes.

16       Q     And so do the other people that are on the search?

17       A     They do.

18       Q     And when you seize anything, when you take anything

19  you have a method for recording that?

20       A     Yes.

21       Q     The five firearms that you identified as having

22  found at Dr. Sachy's clinic were seized?

23       A     Yes.

24       Q     You followed the procedure to record what firearm

25  was taken?

1        A    Yes.

2        Q    Serial number of that firearm and a description of

3   the type of the gun it was?

4        A    Yes.

5        Q    And where it was located?

6        A    Yes.

7        Q    Even if you didn't personally find that firearm, you

8   expected that the officer who did find it to do that; to write

9   down what the gun was and where it was found?

10       A    Yes, ma'am.

11       Q    And another important characteristic of what you're

12  looking for, as you are taking a firearm into custody, is

13  whether the firearm was loaded or unloaded?

14       A    That's correct.

15       Q    You would have made that notation on your record?

16       A    Not necessarily on my records, but somebody would

17  have.  Whoever seized it should make that notation, yes,

18  ma'am.

19       Q    And that would have been the stuff that you would

20  have provided to Ms. Booker as well, concerning the search and

21  seizure?

22       A    Yes.

23       Q    You testified at the motion for detention hearing

24  that there was a firearm in the reception area right at the

25  front window in a cabinet.  Do you recall saying that?

1        A     Yes, ma'am.

2        Q     And do you recall that being the case?

3        A     As I understand where it was found -- I was not

4   physically present at the time that it was found.  But it's my

5   understanding that it was located in that front reception area

6   in a cabinet.

7        Q     I want to show you -- you did walk around the clinic

8   and you're familiar with the clinic itself?

9        A     Briefly.  I couldn't tell you exactly where

10  everything was.  I spent very little time in the clinic

11  actually.

12       Q     But you were comfortable enough to testify about the

13  reception area and the location of the firearm that someone

14  else found?

15       A     I was told where it was found, yes, ma'am.

16       Q     I want to show you what I've marked as Defendant's

17  Exhibit Number 5.  Do you recognize that as the reception area

18  of the clinic?  And I understand there is writing on this

19  document.

20       A     Yes, ma'am.  That looks like the reception area.

21       Q     The reception area has a window that looks out into

22  where the patients would sit?

23       A     Yes, ma'am, it does.

24       Q     You see that?

25       A     Uh-huh (affirmative).

1      Q     And you see where there is an L-shaped table where

2   one would assume the receptionist would sit?

3      A     Yes, ma'am.

4      Q     And what you understand is that the firearm in the

5   reception area was located in a cabinet?

6      A     Yes.

7      Q     You also understood that the gun that was found in

8   the reception area was different than the other guns in that

9   it was a much older gun?

10      A     That's correct.

11      Q     And you also know that that gun was not loaded?

12      A     Yes.  I have been told it was not loaded.

13           MS. HOGUE:  Your Honor, would you like me to pass a

14   copy of the exhibits to you as well, Your Honor?

15           THE COURT:  Whatever works for you is fine.  If

16   you've got two copies, I'll take one.

17           Any objection from the government?

18           MS. BOOKER:  No, Your Honor.

19           MS. HOGUE:  I tender number 5.  I don't believe I

20   did that.

21           THE COURT:  Any objection?

22           MS. BOOKER:  No, Your Honor.

23           THE COURT:  It's admitted.

24                    (Defendant's Exhibit # 5 was admitted)

25   ///

1    BY MS. HOGUE:

2         Q     You also testified about a firearm that was found in

3    Dr. Sachy's -- in his desk?  Under his desk, I believe?

4         A     On the side of his desk, yes, ma'am.

5         Q     On the side of his desk.  And you said that that was

6    an exam room?

7         A     Yes, ma'am.  There is an exam table in there and I

8    understand that exams take place in there, yes, ma'am.

9         Q     And at first that sounded kind of -- we had to look

10   into that.  The examination room is also Dr. Sachy's office,

11   as far as you can tell from looking at it.  It has a desk on

12   one side of it and an examination table on the other.

13        A     Okay.  Yes.

14        Q     Is that how you recall it?

15        A     Yes.  There is an exam table in the same room that

16   his desk is there, yes.

17        Q     So, for example, if one were doing psychiatry one

18   could be sitting at the desk talking to patients in those

19   chairs or if one were conducting a physical exam one could

20   walk across the room and conduct an examination on the other

21   part of that room?

22        A     Yes.

23        Q     And finally, Officer Morrow, you testified about the

24   information that was on the external hard drive found in a

25   satchel belonging to Dr. Sachy.  That you understood belonged

1  to Dr. Sachy?

2      A    Yes, ma'am.  There were four external hard drives in

3  that satchel.

4      Q    And in one of those external hard drives there was

5  information on you, another investigator and photographs --

6  we'll just call it the digital folder.  How about that?  Do

7  y'all understand what we're talking about here?

8      A    Yes, ma'am.  There were actually two external hard

9  drives that contained relatively the same information, so I

10 don't know if one was copied onto another one.  But our

11 personal information was actually on two external hard drives

12 located in the satchel with a firearm.

13     Q    Two of the hard drives with that folder that were

14 virtually the same?

15     A    Correct.

16     Q    Then you testified that there were not only images

17 that appeared to come from social media, from Facebook?

18     A    Uh-huh (affirmative).

19     Q    Yes?

20     A    Yes.

21     Q    And images of you sometimes with your wife or

22 another woman in the photograph?

23     A    No, ma'am.  Not my wife, Officer Vickery's wife.

24     Q    Is it Vicker or Vickery?

25     A    Vickery.

1      Q    Vickery.  Thank you.

2      And then you testified that there were also profiles of

3  some identifying information about you?

4      A    That's correct.

5      Q    And your testimony was -- and I'm referring to

6  page 21 of the transcript -- it appears that Dr. Sachy paid

7  for an information service to get home addresses and phone

8  numbers.  That's what you testified to.  Is that what you

9  still believe today?

10     A    No, ma'am.  I do not believe that today.

11     We actually researched a little more on that.  I believe

12  that when I testified that the information came from Spokeo,

13  which we looked up and as you get into Spokeo you put

14  somebody's name in there and it gives you so much and then you

15  have to pay for additional information.  We were actually able

16  to find what I believe is information that Dr. Sachy looked up

17  on myself and my wife on an open-source through a website

18  called People Finder.

19     Q    And that source does not require anyone to pay?

20     A    No, ma'am, you just search.  You search a name, yes.

21     Q    When did you realize that your testimony was in

22  error?  Not purposefully, I understand that.  That you were

23  wrong?  When did you come to that realization?

24     A    Actually yesterday when we had time to do a little

25  more research.

1     Q     That you discovered that this was not a paid

2     information service, but instead an information -- a public

3     record information gathering service that you can access for

4     free?

5     A     It was disturbing nonetheless, but yes, ma'am.

6     Q     And I have no doubt about that.  But I want to

7     clarify what you had testified to; is that it was something

8     that was purchased and you now have discovered that it was

9     not?

10    A     That's correct.

11    Q     Do you know whether anyone had made any attempts,

12    before this hearing, to let Judge Weigle know that your

13    testimony was wrong?

14    A     No, ma'am.  I'm not aware of that.

15    Q     And the public information -- the information that

16    we're talking about -- I'm going to show you what I've marked

17    as Defendant's Exhibit 6.  This is the kind of thing that was

18    on there.  Not the kind of thing, that's the thing that was

19    your public information?

20    A     Yes, ma'am, that's correct.

21          MS. HOGUE:  And I'm going to hand this up to the

22    Court.

23    BY MS. HOGUE:

24    Q     That you now know anyone right now could get on

25    their phone and access as well?

1        A    Correct.

2        Q    And you would agree that the only way that a person

3    could get photographs of you or your -- the other agent

4    involved in the case off of Facebook is if someone did not

5    secure their Facebook access?

6        A    That's correct.

7             MS. HOGUE:  I have no more questions.  Thank you.

8             MS. BOOKER:  Your Honor, can I just make a couple of

9    notes for the record before I begin.

10            For Defendant's Exhibit 5 I know that I did not

11   object to the actual picture, but I do object to the

12   depictions, the writing on the picture.

13            Agent Morrow testified that he did not know about

14   the writing but he was familiar with the actual picture of the

15   clinic itself.  So I don't mind the exhibit being admitted but

16   not the writing thereon.

17            THE COURT:  Well, I'll just consider that for what

18   it is.  I know that writing is not actually on the wall in

19   that office.

20            MS. BOOKER:  Right.  I just wanted to note it for

21   the record, Your Honor.

22            And then for purpose of the record Agent Vickery's

23   name is spelled, V-I-C-K-E-R-Y.

24            Your Honor, may I approach?

25            THE COURT:  Yes.

```
 1                        CROSS EXAMINATION
 2   BY MS. BOOKER:
 3       Q    Agent Morrow, I'm handing you what's going to be
 4   marked as Government's Exhibit 9.  This is a composite
 5   exhibit.  Do you recognize Exhibit 9?
 6       A    Yes, ma'am.  Those were the firearms located at the
 7   clinic.
 8       Q    Is that a true and accurate depiction of the
 9   firearms as they were located at the clinic on the date of the
10   search of this case?
11       A    (No response).
12       Q    Is that a true and accurate depiction of the
13   firearms as they were located at the clinic?
14       A    The firearms that are depicted on the third and
15   fourth picture from Hamilton and Ennis are located in their
16   purses, I believe.  The fifth firearm, the revolver in the
17   front desk, those are just being held up.  So they are not
18   actually being depicted where exactly they were found.
19       Q    Let's start with page 1.  Can you describe page 1 of
20   this exhibit?
21       A    Yes, ma'am.  Page 1 is the firearm that was located
22   in the satchel belonging to Dr. Sachy that also contained the
23   four external hard drives.  The firearm was in with the hard
24   drives.
25       Q    And then let's go to page 2.  Can you describe what
```

1   that is?

2        A     This is a firearm that was hanging on a hook right

3   as Dr. Sachy would sit at his desk on the right side.  Where

4   you could put your hand down by your thigh was a loaded

5   firearm just hanging on the hook.

6        Q     Page 3?

7        A     The Taurus was in Ms. Hamilton's purse, I believe.

8        Q     You all attribute this firearm to Ms. Hamilton and

9   not Dr. Sachy, correct?

10       A     Correct.

11       Q     Page 4?

12       A     Is a firearm belonging to Ms. Ennis, also located in

13  her purse I'm told.

14       Q     You attributed that to Ms. Ennis and not Dr. Sachy,

15  correct?

16       A     That's correct.

17       Q     And finally page 5?

18       A     Is a revolver in the front office of the reception

19  area.

20       Q     And is this the same revolver that you just

21  testified about with Ms. Hogue when she was pointing out

22  Defendant's Exhibit 5 that was in that cabinet?

23       A     That's correct.

24             MS. BOOKER:  Your Honor, I would like to move to

25  admit Government's Exhibit 9 at this time.

1          MS. HOGUE:  No objection.

2          THE COURT:  Admitted.

3                 (Government's Exhibit # 9 was admitted.)

4    BY MS. BOOKER:

5      Q    Ms. Hogue also talked about the corrected

6    information as to what was found on Dr. Sachy's hard drive in

7    terms of the personal information related to you and your

8    wife.  You informed me of that yesterday, as you testified, is

9    that correct?

10     A    That's correct.

11     Q    Did we discuss any plans to make the Court aware of

12   that today during this hearing?

13     A    Yes, we did.

14     Q    Were there any attempts to hide the ball?

15     A    Absolutely not.

16     Q    And whether or not this information was paid for, it

17   went beyond just information about you, the investigating

18   officer?  Was there information about your family members

19   outside of your wife?

20     A    Outside of my wife?  No.  Outside of Clarke's wife?

21   Yes.

22     Q    On that Defendant's Exhibit 6 there are also other

23   family members listed.  Are those your actually family

24   members?

25     A    Excuse me.  Yes, those are my family members.

1      Q    And those were found on the hard drive.  Were they

2  found like in a browser?  Would somebody have to copy and

3  paste that?  How were these items found to be on the hard

4  drive?

5      A    They were in individual folders.

6      Q    I'm showing what's been marked as Government

7  Exhibit 5.  Do you recognize this item, Agent Morrow?

8      A    Yes, ma'am, I do.

9      Q    What is that?

10      A    Those are pictures of children.

11      Q    Is this also a composite exhibit; meaning it has

12  more than one page?

13      A    Yes, ma'am.

14      Q    So on page 1 what does it show?

15      A    Four young children.

16      Q    On page 2?

17      A    Two children.

18      Q    On page 3?

19      A    Two children.

20      Q    Page 4?

21      A    It looks like two more children.

22      Q    And page 5?

23      A    The same picture except it doesn't have "Happy

24  Thanksgiving" on it with the two children.

25      Q    Do you know whose children these are?

```
 1        A     They are Officer Clarke Vickery's grandchildren.

 2        Q     And is he an Investigating Officer on this case?

 3        A     Yes.

 4        Q     And where were these pictures found?

 5        A     These were found in file folders located on two

 6   external hard drives belonging to Dr. Sachy.

 7        Q     And is Clarke Vickery and/or any other adult

 8   pictured in these photos?

 9        A     No, ma'am, not in these folders.

10             MS. BOOKER:  At his time I'd move to admit

11   Government's Exhibit 5.

12             MS. HOGUE:  No objection.

13             THE COURT:  It's admitted.

14                   (Government's Exhibit # 5 was admitted.)

15             MS. BOOKER:  Just as I did in the last hearing, I

16   have a redacted version as well as an unredacted version.  I

17   would like the redacted version -- if we have to put it on the

18   record I would like the redacted version to be put on the

19   record, but I have the original for Your Honor to view without

20   the redactions as well.

21   BY MS. BOOKER:

22        Q     I'm showing the witness what's been marked as

23   Government's Exhibit 6.

24        Agent Morrow, do you recognize Government's Exhibit 6?

25        A     Yes, ma'am, I do.
```

```
 1        Q    Is that also a composite exhibit?

 2        A    It is.

 3        Q    Consisting of two pages?

 4        A    Yes.

 5        Q    What's on the first page?

 6        A    First page is my information, Ken R. Morrow, the

 7   city I live in, phone number, address, previous locations and

 8   relatives.

 9        Q    Is this the same information that was included in

10   Defendant's Exhibit 5 that Ms. Hogue showed you a moment ago?

11        A    That's correct.

12        Q    What about the second page of the exhibit?

13        A    The second page is my wife's information, the city

14   where she lives, where I live, relatives, our home phone

15   number, a partial e-mail address, our address, and the

16   previous locations where she has lived.

17        Q    And where was this information found?

18        A    On a separate file folder next to mine on external

19   hard drives.

20        Q    So was this also downloaded onto Dr. Sachy's hard

21   drive?

22        A    It was.

23        Q    Is that a true and accurate depiction as it was

24   found on Dr. Sachy's hard drive?

25        A    Yes, ma'am.
```

 1              MS. BOOKER:  Your Honor, at this time, I move to

 2    admit Government's Exhibit 6 with the same caveat that there

 3    is a redacted version and an unredacted version.

 4              MS. HOGUE:  No objection.

 5              THE COURT:  It's admitted.

 6                   (Government's Exhibit # 6 was admitted.)

 7              THE COURT:  What I'm going to do, unless there's any

 8    objection from the parties, would be to enter the redacted

 9    versions in the record and let the parties hold onto the

10    unredacted versions rather than file them under seal.  I just

11    can't imagine any objection to that.

12              MS. HOGUE:  No objection.

13              MS. BOOKER:  No, Your Honor.  Thank you.

14    BY MS. BOOKER:

15        Q    Was there also additional information that was found

16    on Dr. Sachy's hard drive?

17        A    Yes, ma'am.

18        Q    Any information that would go to whether or not he's

19    a danger to the community?

20        A    Absolutely.

21        Q    What information was that?

22        A    There were multiple pictures of gruesome violence,

23    beheadings, videos, war videos, extensive pornography,

24    personal information on multiple -- they were taped

25    conversations of other officers.  There was actually a

1    surveillance video.  I don't know if it was done by Dr. Sachy

2    or a private investigator, but somebody being surveilled,

3    unbeknownst to them, at their house.  They were driving

4    around.  And I might add --

5              MS. HOGUE:  Your Honor, I have to object.  An idea

6    of somebody videotaping -- I'm not sure, first of all, that

7    this goes to any issue of violence.  If we don't know who the

8    videotape is of, when it was taken, what's the point of it?

9    Just the idea that somebody has a videotape of somebody else.

10   I think this is getting far afield.

11             I realize that the rules of evidence are relaxed,

12   but this is getting a little dangerously close to making

13   inferences that resulted in the kind of conclusion the Court

14   was left with, just a few weeks ago, that Dr. Sachy had paid

15   an information service by saying "I believe this is what

16   happened."

17             So I think we need to hold Officer Morrow to a

18   little higher standard in this evidence that he's presenting,

19   this testimony.

20             MS. BOOKER:  Your Honor, Officer Morrow just

21   testified that he doesn't know who is in the video but that

22   there were surveillance of people on there.  He's just stating

23   the fact that there was surveillance of some people on

24   Dr. Sachy's hard drive.  We can stay away from the

25   surveillance if Your Honor prefers.

1          I can go back to the depictions of violence which

2   goes directly to whether or not he's a danger to the community

3   as opposed to the pure surveillance.

4          THE COURT:  Well, without having the video for me to

5   look at -- I might like some more detail about what we are

6   talking about exactly.  I don't really understand what this

7   video is of.  Is there more than one?

8          MS. BOOKER:  I'll move on to the depictions of

9   violence, Your Honor.

10          THE COURT:  Then I'll sustain the objection on that

11   issue then.

12          MS. BOOKER:  I'm showing Officer Morrow what's been

13   marked as Government's Exhibit 7 first.

14   BY MS. BOOKER:

15       Q    Do you recognize that item, Agent Morrow?

16       A    I do.

17       Q    Is that also a composite exhibit?

18       A    It is.

19       Q    And what is on page 1 of that exhibit?

20       A    It's a person who's head has been partially severed.

21       Q    And what about page 2 of that exhibit?

22       A    Is somebody deceased on a street with their body

23   parts all over the place.

24       Q    At page 3 of that exhibit?

25       A    It looks like a corpse that has had a bullet hole

1    right in it's forehead.

2         Q    And where were those pictures found?

3         A    These are some of the violent images located on the

4    external hard drives.

5         Q    And is that a true and accurate depiction of the

6    images as they were found on Dr. Sachy's hard drive?

7         A    They are.

8         MS. BOOKER:  Your Honor, I move to admit

9    Government's Exhibit 7 at this time.  I also have a redacted

10   version for the Court.

11        MS. HOGUE:  I object, Your Honor.  There's no

12   relevance to these photographs.  When we're talking about the

13   crime that Dr. Sachy is accused of and trying to suggest that

14   someone who has gathered photographs, for purposes we'll be

15   able to certainly explain, has some relationship to being a

16   violent person.

17        MS. BOOKER:  Your Honor, this isn't going to the

18   crime.  It's going directly to the factors under 3142(g)

19   whether or not he's a danger to the community and whether or

20   not his release poses a risk to others and whether or not

21   there are any conditions that will reasonably assure the

22   community that they will be safe.

23        The fact that he has these -- and I'm going to argue

24   this later, but the fact that he has these depictions of

25   violence goes directly to that factor, Your Honor.

1          THE COURT:  Well, I'm going to overrule the

2    objection.  I think they are relevant, but the weight that is

3    to be given to them is another issue.  Of course they were

4    mentioned at the previous hearing as well.  I didn't see them.

5    I'm not sure I want to see them now.

6          MS. BOOKER:  They are admitted, Your Honor?

7          THE COURT:  They are admitted.

8                    (Government's Exhibit # 7 was admitted.)

9          MS. BOOKER:  Agent Morrow he has both 7 and the

10   redacted version 7-R.

11         THE COURT:  All right.

12         MS. BOOKER:  And I recognize these images are

13   disturbing, Your Honor, but I felt it necessary to show the

14   Court exactly what we are talking about.

15   BY MS. BOOKER:

16   Q    Agent Morrow, can you go to Government's Exhibit 8.

17   A    Yes, ma'am.

18   Q    Do you recognize that item?

19   A    I do.

20   Q    What are those items?

21   A    This is a picture of a soldier with a flame thrower

22   with a caption saying "Just Watering My Muslims."

23   Q    Let me back up.  Is that also a composite exhibit?

24   A    It is.

25   Q    Consisting of multiple pages?

1        A     It is.

2        Q     And you just described the Muslim comment that was

3    on page 1 of that exhibit?

4        A     Yes.

5        Q     What is on page 2?

6        A     Page 2 is soldiers standing in front of a man that

7    is bloodied and has his face blacked out, looks like something

8    from Iraq or Afghanistan.

9        Q     Page 3?

10       A     It appears to be a Muslim woman, half buried,

11   crying. I'm assuming she's getting ready to be stoned in their

12   culture.

13       Q     Page 4?

14       A     This is a soldier posing with, looks like, Sadam

15   Hussein's corpse.

16       Q     Page 5?

17       A     Iraqi prisoner of war with his head covered and a

18   soldier standing around him.

19       Q     Page 6?

20       A     Possibly another Muslim with soldiers standing

21   around him and has a gun pointed to his head.

22       Q     Where were those items found?

23       A     These were all located on the external hard drives

24   of Dr. Sachy's that were found in Sachy's bag.

25       Q     Is that a true and accurate depiction of the photos

1   as they were found on Dr. Sachy's hard drive?

2       A    It is.

3           MS. BOOKER:  Your Honor, at this time I move to

4   admit Government's 8.

5           MS. HOGUE:  I stand by my objection, Your Honor.

6   This is just to inflame you.  There's no other purpose for it.

7           THE COURT:  Well, I do think it's relevant.  I agree

8   that it is inflaming, but I think it is relevant to what we're

9   talking about here so I will admit it.

10                  (Government's Exhibit # 8 was admitted.)

11  BY MS. BOOKER:

12      Q    And Ms. Hogue mentioned the fact that there was an

13  incident, at least one other time, wherein the Sachy's had to

14  call the police on a person who was attempting to get drugs

15  and there were charges filed against that person.  That person

16  was attempting to get drugs outside of the clinic?

17      A    Yes, ma'am.

18      Q    Were you aware of these other incidents or incidents

19  such as this at Dr. Sachy's clinic?

20      A    I've heard of that incident, yes.

21      Q    And how do these incidents usually happen?

22          MS. HOGUE:  Objection, Your Honor.  How do these

23  incidents usually happen?  We have an incident report that is

24  in evidence.  Unless Officer Morrow was a part of that

25  investigation he really can't talk about how things like this

1    usually happen.

2              THE COURT:  You do need to rephrase that question.

3    I'm not sure I understand what you're asking him.

4              MS. BOOKER:  I will rephrase the question.  But

5    Officer Morrow just testified that he was aware of this and

6    other incidents at the clinic.  So I was going directly to

7    these incidents occurring at the clinic.  Outside of Mr. Duc,

8    in addition to the other incidents at the clinic wherein

9    people were doing these things and so over the course of this

10   investigation I'm sure that he has an explanation as to how

11   these happened.

12             THE COURT:  Well see if you can ask him some more

13   specific questions.  That question was pretty broad and I'm

14   not sure I would know how to answer that.

15             MS. BOOKER:  I'll rephrase.

16   BY MS. BOOKER:

17        Q    Over the course of your investigation, have you come

18   to familiarize yourself or be made aware of other incidents

19   related to similar activities as Ms. Hogue elicited as to

20   Mr. Duc, the person that was arrested in 2017?

21        A    I am.

22        Q    And what are those incidents?

23        A    They are incidents of similar nature; unruly

24   patients, police being called.  There was one instance where I

25   believe a guy was arrested in the parking lot and had drugs on

1   him and those types of things.

2        Q    Can you describe the characteristics of these people

3   in terms of whether or not they had any type of addiction?

4             MS. HOGUE:  Objection, Your Honor.  He would be

5   going only by incident reports.  And if Ms. Booker has those

6   incident reports, as I've read them, then she needs to tender

7   those instead of having this Officer guess about whether those

8   persons were on drugs, dependent on drugs, needed opioids, et

9   cetera.

10            MS. BOOKER:  Again, Your Honor, he just said he

11  knows about this over the course of his investigation.  So he

12  is testifying from his investigative experience in this

13  investigation.

14            THE COURT:  I will allow him to testify to what he

15  knows.

16  BY MS. BOOKER:

17       A    THE WITNESS:  I interviewed one former patient who

18  was arrested in the parking lot who was addicted to heroin.

19  And I'm not sure how much you want to know about that

20  particular patient or former patient.

21       Q    Were there other patients that exhibited these same

22  behaviors?

23       A    Yes.

24       Q    Was this common with Dr. Sachy's clinic, over the

25  course of your investigation?

1      A    It is.

2      Q    That you ran into people with these behaviors?

3      A    Yes.

4      Q    In addition to the behavior at the clinic, were

5  there any other behaviors or red flags that you noticed that

6  were indicative of pill mill behavior, over the course of your

7  investigation?

8      A    Yes.

9          MS. HOGUE:  Objection, Your Honor.  We're now trying

10  the case.  We're here answering questions about issues

11  concerning only risk of flight and danger to the community.

12  Whether Officer Morrow knows anything about the nature of the

13  patients in the clinic is irrelevant to this hearing.

14          MS. BOOKER:  Your Honor, if Dr. Sachy is released

15  it's only fair to assume that he would go back to treating and

16  seeing patients at a clinic.  Not necessarily one in Gray, but

17  another clinic or other medical settings.

18          THE COURT:  Well, that's not necessarily fair to

19  presume that.  I could impose a condition of release that he

20  not practice medicine.

21          MS. BOOKER:  Well, this line of questioning goes in

22  support of my request for that specific condition.

23          THE COURT:  I don't want to try the case.  You know,

24  you can ask a couple of questions along that line. I think

25  I've got a pretty good flavor of those issues.

1          I will overrule the objection, but I don't want to

2    get real deep into this issue, Ms. Booker.

3          MS. BOOKER:  Okay, Your Honor, I will move on.

4    BY MS. BOOKER:

5    Q    Did you also find anything, over the course of your

6    investigation, to confirm or deny whether or not Dr. Sachy had

7    actually been held in contempt in Jones County related to his

8    abatement of court orders?

9    A    Yes.  That was confirmed.

10   Q    And what did you find?

11   A    There were court orders located in the hard drives

12   to that effect exactly that he was found in contempt of court

13   and ordered to be incarcerated.

14   Q    And was he, in fact, incarcerated?

15   A    He was.

16   Q    And what was the purpose of that incarceration?

17   What was the reason he was held in contempt?

18   A    For failing to turn over monetary amounts to his

19   ex-wife.

20   Q    And what was that amount, if you recall?

21   A    I believe it was in the neighborhood of $980,000.

22         MS. BOOKER:  I believe that's all that I have, Your

23   Honor.

24         THE COURT:  Redirect.

25         MR. HOGUE:  Your Honor, a brief redirect and I'm

1   going to conduct it because of the new information that has

2   just been presented that we haven't seen before.  I'm sitting

3   next to Dr. Sachy who is writing me notes and so now I have a

4   few questions for the Officer about these exhibits.

5                          REDIRECT EXAMINATION

6   BY MR. HOGUE:

7       Q    Officer Morrow, what is the number of the exhibit

8   that has the photos of the guns in it?

9            MS. BOOKER:  It's going to be 9.

10           MR. HOGUE:  9?

11           MS. BOOKER:  Yes.

12  BY MR. HOGUE:

13      Q    Exhibit 9 of photos 1 and 2 in Exhibit 9, those are

14  guns you have learned, through your investigation, belonged to

15  Dr. Sachy?  Those are the two that he owned?

16      A    The ATF traces have come back.  I was not the

17  Officer in charge of receiving the traces back.  So I cannot

18  directly testify as to who owned these firearms just that they

19  were located in his clinic on or around him at the time.

20      Q    Okay.  Number 1 is the one taken from his satchel.

21  Photo number 2 is the one of the gun hanging on the hook under

22  the desk?

23      A    Yes, sir.

24      Q    Now because you were the lead agent and you're

25  familiar with what your other officers were doing, you are

1   aware then and can tell the Judge that Dr. Sachy told the

2   agents where these guns could be found?  Pointed them out and

3   said where they were?

4       A    I was not in the room when Dr. Sachy was

5   interviewed.

6       Q    But you don't have any basis to dispute that he told

7   agents "You can find these guns in these places?"

8       A    No, sir, I cannot dispute that.

9       Q    Now Exhibit 5, the photos of kids.  Those are photos

10  taken from Facebook?

11      A    Correct.  Officer Vickery's wife's Facebook page.

12      Q    And you've already said that it was public and

13  anyone could look at her Facebook page and see those photos,

14  right?

15      A    Yes, sir.

16      Q    Now Exhibit 7, which are the three graphic photos of

17  people in various gory states.  You know that Dr. Sachy had --

18  first of all, he's a psychiatrist so he has some educational

19  background in neurology or neuroscience?

20      A    Yes, sir, I understand that.

21      Q    You know that his ex-wife, Melissa Sims, now Melissa

22  Sims Stanley, was then, at the time of their marriage, and is

23  still, a medical examiner.  She conducts autopsies?

24      A    Yes, sir, I'm aware of that.

25      Q    And the third of the photos in this Exhibit 7 has a

1    woman who appears to have been shot in the forehead by a gun,

2    and on her chest is an identifier that says 2005-4002160 and

3    then the letters DOFS.  Now, you're familiar, aren't you, that

4    that would be DOFS -- Division Of Forensic Sciences?

5         A    Yes, sir, I'm aware of that.

6         Q    A division of the GBI, right?

7         A    Yes, sir.

8         Q    Where Dr. Sims Stanley is employed?

9         A    Yes, sir.

10        Q    And 2005 would suggest to you that's the year of

11   this photo?

12        A    Yes.

13        Q    And the other numbers would be the case number,

14   right?

15        A    Correct.

16        Q    So you don't know whether Dr. Sims took this photo

17   and during their marriage left it on a computer that now

18   Dr. Sachy has?  You don't know where it came from, do you?

19        A    No, sir.

20        Q    The same with the other two photos, the gory photos

21   of people who have been mutilated.  You don't know where those

22   came from?

23        A    I don't know where they came from.  I only know that

24   he was in possession of them, yes, sir.

25        Q    You don't know why he had them?  You just know that

1    they were on his computer?

2         A    I've not interviewed Dr. Sachy as to why he has

3    them, sir.

4         Q    All right.

5         Now, Exhibit Number 8, that appears to have photos

6    connected to Muslims or Islams.  You found these on his

7    computer?  You personally?

8         A    Our intel-analyst did the vast majority of -- there

9    are almost four terabytes of information on those between the

10   two external hard drives.  So what we're looking at, sir, is

11   just what we could find after a couple hours of research.

12        Q    But I suppose you're offering them today for the

13   purpose, we can infer, to show that Dr. Sachy is dangerous?

14        A    Absolutely.

15        Q    Because he has these photos?

16        A    Yes, sir.

17        Q    You know that the agent who found these found them

18   in a folder labeled book?

19        A    I don't recall which folder they came out of, sir.

20        Q    So you don't have the basis to dispute that?  That

21   they came out of a folder labeled book?

22        A    No, sir, I cannot dispute that.

23        Q    You don't know then whether Dr. Sachy had collected

24   these in connection with a book he was working on on post 911

25   war on terror?

 1        A    No, sir, I don't know.

 2        Q    And the one "Just Watering My Muslims."  You don't

 3   know whether he found that or whether someone sent it to him,

 4   do you?

 5        A    No, sir.  I don't know where they came from.

 6        Q    Same with all these photographs, you don't know

 7   whether he looked them up or some people sent them to him?

 8        A    I just know that they were on his hard drive.

 9        Q    That's all you know?

10        A    (Witness nodding affirmatively.)

11             MR. HOGUE:  That's all I have.

12             MS. BOOKER:  I don't have anything further, Your

13   Honor.

14             But I would like to assemble Exhibit 9.

15             THE COURT:  All right.  I think these are the

16   redacted exhibits that were given to me.

17             MS. HOGUE:  And while you're doing that, Your Honor,

18   I'm going to step out and make sure that my witnesses are

19   here.

20             THE COURT:  Do you want to take a break for about

21   five minutes?  We've been going for about an hour.

22             MS. HOGUE:  Thank you.

23             THE COURT:  Let's take about five minutes while

24   y'all get all that together.

25             CSO OFFICER:  All rise.

1      (Recess at 10:54 AM)

2      (Reconvene 11:03 AM.)

3           CSO OFFICER:  All rise.  Please be seated and come

4    to order.

5           THE COURT:  All right.  Ms. Hogue, you can call your

6    next witness.

7           MS. HOGUE:  Thank you, Your Honor.  Pam Williamson.

8           COURTROOM DEPUTY:  Do you solemnly swear that the

9    testimony you are about to give is the truth, the whole truth,

10   and nothing but the truth, so help you God?

11          THE WITNESS:  I do.

12          COURTROOM DEPUTY:  Would you state and spell your

13   name for the record, please.

14          THE WITNESS:  Pamela Williamson.  P-A-M-E-L-A

15   W-I-L-L-I-A-M-S-O-N.

16                    PAMELA WILLIAMSON

17          Whereupon, witness having been duly sworn,

18                testified as follows:

19                  DIRECT EXAMINATION

20   BY MS. HOGUE:

21      Q    Ms. Williamson, what do you do for a living?

22      A    I'm a pharmacist.

23      Q    Do you want to move the mike a little bit so that

24   you don't have to lean over.  Is that better?

25      A    Okay.

1        Q     How long have you been a pharmacist?

2        A     Since 1988.

3        Q     And, just briefly, what is your educational and work

4     background?

5        A     I'm a BS in pharmacy.  I have owned my own store, my

6     father owned it.  So I worked for him.  And I have been a

7     staff pharmacist.  I have been a PIC.  I have been a district

8     manager.  I've done a little bit of it all.

9        Q     Do you know Dr. Sachy?

10       A     Yes, I do.

11       Q     How do you know Dr. Sachy?

12       A     He is my brother's doctor.

13       Q     About how long has your brother been seeing

14    Dr. Sachy?

15       A     I know it's over ten years.

16       Q     Why does your brother see Dr. Sachy?

17       A     My brother is a chronic pain patient.  He has a rod

18    in his leg.  He's got a rod in his arm.  His pelvis has been

19    rebuilt.  Both hips have been replaced twice.  He's got a

20    plate in his hand.  He had rods in his back.  They broke.

21    Yes, the titanium rods broke and it cut his muscles.  He also

22    is bipolar and also with some delusional disorder.

23       Q     Are you familiar with your brother's situation

24    because you're in contact with him regularly?

25       A     Oh yes.  He lives with me because he's totally

1   disabled.

2         Q    Do you accompany him on his doctor's appointments?

3         A    Yes, I do.

4         Q    As a result of that, did you form a collegial

5   relationship with Dr. Sachy?

6         A    Yes, I did.

7         Q    Did you ever become aware of an investigation that

8   was going on against Dr. Sachy?

9         A    Yes, I did.

10        Q    How did you become aware of it?

11        A    The DEA had gone to different pharmacies requesting

12   Dr. Sachy's records.

13        Q    Did you ever discuss that with Dr. Sachy?

14        A    Yes, I did.

15        Q    In the course of discussing that with Dr. Sachy, did

16   you ever become aware of any images that Dr. Sachy had related

17   to those investigators?

18        A    I don't understand the question.

19        Q    Let me say it a different way.  In discussing that

20   with Dr. Sachy, did he ever share with you or did you become

21   aware of any photographs, any pictures, that Dr. Sachy had

22   related to those investigators?

23        A    Yes.

24        Q    Were you aware of information that he had gathered

25   relating to those investigators?

1      A     Some.

2      Q     How did you become aware of those photographs?

3      A     He showed them to me.

4      Q     Why did that happen?

5      A     We were discussing the agents that were causing his

6  patients griefs where they could not get their medicine

7  because certain pharmacies were not filling their

8  prescriptions.  And so -- I would like to know what they

9  looked like and so he showed me.

10     Q     Did he provide you with those -- allow you to take a

11 look at those photographs?

12     A     Yes, he did.

13     Q     And did it appear to you as if those were taken from

14 Facebook or could you figure out where they were taken from?

15     A     It looked like it could be Facebook.  I mean, it

16 looks like a Facebook picture.

17     Q     Did he say anything to you about why he had those

18 photographs?

19     A     Well, more or less he was trying to find out who was

20 trying to find out about him.  Who had investigations on him.

21     Q     Did he comment in any way about whether it was hard

22 or whether it was easy to figure out who was looking at him?

23     A     He said it was easy.  You could just go on Facebook

24 or the Internet and find out what he wanted.

25     Q     In the course of discussing his feelings about being

1   investigated, did he ever say anything to you that suggested

2   that he wanted to harm these investigators?

3       A    No.

4       Q    Did he ever suggest anything to you about something

5   he wished to do with this information that might be harassing

6   or intimidating to those agents?

7       A    No.

8       Q    Have you ever heard, outside of the photographs,

9   outside of the images of the photographs that he had, did you

10  ever hear him suggest anything harmful that he wanted to do to

11  these agents?

12      A    No.

13          MS. HOGUE:  I have no more questions.

14                      CROSS EXAMINATION

15  BY MS. BOOKER:

16      Q    Dr. Williamson?  Is it Doctor?

17      A    No it's BS.  I'm not a doctor.

18      Q    Okay.  Ms. Williamson, my apologies.

19  Did you also ask to see pictures of the children of the

20  investigating officers?

21      A    No.

22      Q    Did you ask about contact information or pictures of

23  their wives?

24      A    No.

25      Q    Did you ask about their personal information, such

1   as their home address, phone number or e-mail addresses?

2       A    No.

3       Q    Were you curious to see that information as well?

4       A    No.

5       Q    Are you familiar with whether or not Dr. Sachy has

6   any qualifications to treat chronic pain?

7       A    Yes.

8       Q    What qualifications are those?

9       A    He has a medical degree.  He's also a psychiatrist.

10      Q    Does that go to whether or not he can treat chronic

11  pain, him being a psychiatrist?

12      A    If you're an MD and you've had -- and you're in

13  psychiatry, you have specialized in psychiatry, yes, you

14  should be able to treat chronic pain.

15      Q    Are you aware that there is a separate certification

16  for pain management and that Dr. Sachy does not have that?

17      A    No, I'm not.

18          MS. BOOKER:  Thank you.

19          MS. HOGUE:  No more questions.

20          THE COURT:  All right.  Ms. Williamson, you may step

21  down.

22          MS. HOGUE:  And may she be released?

23          THE COURT:  She may be released?

24          MS. BOOKER:  Yes, Your Honor.

25          THE COURT:  You may be released.

```
 1              MS. HOGUE:  Mary Logan.
 2              COURTROOM DEPUTY:  Do you solemnly swear that the
 3    testimony you're about to give is the truth, the whole truth,
 4    and nothing but the truth, so help you God?
 5              THE WITNESS:  I do.
 6              COURTROOM DEPUTY:  State and spell your name for the
 7    record, please.
 8              THE WITNESS:  My name is Mary Street Logan, M-A-R-Y,
 9    S-T-R-E-E-T, L-O-G-A-N.
10                         MARY STREET LOGAN
11              Whereupon, witness having been duly sworn,
12                       testified as follows:
13                        DIRECT EXAMINATION
14    BY MS. HOGUE:
15         Q    Dr. Logan, what do you do for a living?
16         A    Well, currently I'm retired.  But prior to that I
17    was a cardiac anesthesiologist.
18         Q    Now, I'm going to need you -- and I know you've got
19    a neck issue and we'll talk about that.  But if you could pull
20    that microphone down a bit.  Are you comfortable sitting up
21    like that?
22         A    Yes.  Can you hear me now?
23         Q    So you are educated and trained in anesthesiology?
24         A    Yes, ma'am.
25         Q    So you are a physician?
```

1        A     Yes.

2        Q     Can you just briefly tell us your medical

3    background?

4        A     I went to medical school at the University of

5    Alabama at Birmingham and won the Marion Sims award in

6    obstetrics and gynecology.  I did an internship in pediatrics.

7    I then went into anesthesia and did a three-year residency in

8    anesthesia and was awarded an outstanding resident award and

9    from there I did a cardiac fellowship with Dr. Al Pacifico in

10   the cardiac department at UAB.

11       Q     What year did you begin practicing anesthesiology?

12       A     After I graduated?  1995.

13       Q     You are not practicing now?

14       A     No, ma'am.

15       Q     Is that as a result of some medical issues?

16       A     Yes.  I have scoliosis that advanced rather suddenly

17   and pretty quickly over the last five years.

18       Q     Do you have any treatment plan in place for that

19   right now?

20       A     Yes, ma'am.  I have two surgeries scheduled at UAB

21   with the chief of orthopedics.

22       Q     Do you know Dr. Sachy?

23       A     Yes, ma'am, I do.

24       Q     How do you know him?

25       A     Dr. Sachy took care of me when I first started

1    having problems with the scoliosis.  I tried to avoid surgery

2    and it didn't work.  And so he has treated me since that time.

3        Q    About how long has he been treating you?

4        A    Five years.  Since 2012, I think.

5        Q    Has he treated anyone else in your family?

6        A    Yes.  My husband was originally treated by a

7    physician in Atlanta.  That office closed and he was referred

8    to Dr. Sachy who is also taking care of my husband, Paul,

9    since then.

10       Q    Your husband did what for a living, ma'am?

11       A    My husband was a Bibb County Deputy Sheriff and also

12   a professional horse trainer.

13       Q    And just basically, generally, what was the

14   condition that Dr. Sachy was treating your husband for?

15       A    My husband had surgery in 1999 by a surgeon licensed

16   by the Georgia Composite Board to do neurosurgery, that I

17   found out later had been fired from his residency.  During the

18   course of that surgery he had an emotional breakdown, he was

19   throwing instruments, he closed a sponge in him.

20       Q    I'm going to say this and I know that there is a lot

21   that you want to talk about but if you can just -- if you can

22   limit it, if you would, Doctor.

23       A    Basically the surgery was a misadventure.  The

24   surgeon didn't get to where he needed to be and as a result of

25   that he damaged the L-4/5 five nerve root ganglion on Paul's

1   right side.

2        Q     And does your husband still suffer from the result

3   of that damage, that botched surgery?

4        A     Yes, ma'am.  The damage was done to the nerve root

5   ganglion and we've been told by everyone that we have ever

6   seen that it can only be treated with medication.  That it can

7   never be repaired and there isn't surgical remedy for that.

8        Q     So you've been to Dr. Sachy's office?

9        A     Yes, ma'am.

10        Q     And you've been to the reception area?

11        A     Yes, ma'am.

12        Q     And you've been back in the examination room?

13        A     Yes, ma'am.

14        Q     For yourself and for your husband?

15        A     Yes, ma'am.

16        Q     Do you also feel as if you have a professional

17   relationship with Dr. Sachy as well, in addition to being his

18   patient?

19        A     To some extent, yes.  We talk about medicine.

20        Q     Did you at some point become aware, when you were a

21   patient, of the office using social media, Facebook

22   specifically, for any purposes related to patient

23   verification?

24        A     Yes.  It's been probably in the last year or last

25   six months.  You know, we started hearing rumors and we asked

1  Dr. Sachy about it and he said at that time that he was

2  concerned because there had been patients that had presented

3  to his office with false credentials.  They weren't who they

4  said they were.

5       Q    And how did he explain to you that he was able to

6  determine that they were not who they said they were?

7       A    Well, he said that on a Facebook page he saw a

8  different identity.  I'm not sure how they got to that or who

9  found that, but it was clear that the person who presented was

10  not the person she represented herself to be.

11       Q    And from your conversations with Dr. Sachy, and

12  perhaps others at the office, what did you understand they

13  used Facebook for when they had concerns?

14       A    I think to verify identities and make sure the

15  patients weren't there under false pretenses.

16       Q    Do you, as a physician, find that to be a good tool

17  for social media?

18       A    I'm not vary savvy about social media.  But I'm

19  feeling a little older.  But, yeah, I mean anything --

20  especially in his line of work I think it's important to

21  verify the patients, that not only they are who they say they

22  are but that they actually have organic disease or problems

23  that they say they have.

24       Q    Were you also aware of the use of cameras at

25  Dr. Sachy's clinic?

1      A    Yes, ma'am.

2      Q    How did you become aware of that?

3      A    Well he told us about it and took our pictures.

4      Q    Whose pictures?

5      A    Dr. Sachy took the pictures of us when we went to

6  see him for a visit.

7      Q    And when you say us, do you mean you and your

8  husband, Paul?

9      A    Yes, and his mother.

10     Q    Paul's mother was a patient as well?

11     A    Yes, ma'am.

12     Q    What did you understand the reason for photographing

13  you was?

14     A    I thought it was important to document the patient's

15  condition, any changes that would happen over time.

16     Q    Do you believe that to be a good diagnostic tool to

17  be able to capture an image of a patient and see changes?

18     A    Absolutely.  I mean, I think it's invaluable.

19     Q    Did you ever become aware of the investigation

20  against Dr. Sachy?

21     A    Yes, I heard it from a pharmacist.  You know, we

22  were told at one point that he was under investigation, which

23  we didn't understand.

24        And so I actually called the DEA and asked if there was a

25  problem.  And I spoke with a Mrs. Bagley who said that -- and

```
 1   she assured me that there wasn't an issue and that the DEA did
 2   not have the money or the resources to do the kind of things
 3   that, you know, we had heard about.
 4        Q    Did you ever talk with Dr. Sachy about the
 5   information you had discovered concerning an investigation?
 6        A    Yes.
 7        Q    But my question is, did you ever talk with him about
 8   it?
 9        A    Yes.
10        Q    And did he share with you what he understood was
11   going on as well?
12        A    On a limited basis.
13        Q    In discussing that with you, did you ever hear
14   Dr. Sachy make any threatening statements regarding the agents
15   that he had become aware were speaking to his patients and
16   speaking to pharmacists?
17        A    No, no.
18        Q    Did you ever hear him say, even jokingly, that what
19   he would like to do to get them to stop doing what they were
20   doing?
21        A    Absolutely not.
22        Q    Did you ever hear him suggest desiring to intimidate
23   them or harassing them because of what they were doing to
24   him?
25        A    No, no.
```

1     Q    Did you ever hear him make any comment about wanting

2  to harm the agents that were investigating him?

3     A    Absolutely not.  I can't imagine Dr. Sachy harming

4  anyone ever.

5          MS. HOGUE:  I have no more questions.

6                      CROSS EXAMINATION

7  BY MS. BOOKER:

8     Q    Good afternoon, Dr. Logan.  Can you hear me okay?

9     A    Yes.

10    Q    I'm sorry to hear about your medical conditions and

11 the fact that you had to retire because of that.

12         THE COURT:  Ms. Booker, if you could stay close to

13 the microphone there.

14         MS. BOOKER:  Okay.  Can you hear me now?  Is that

15 better?

16 BY MS. BOOKER:

17    Q    I said I'm sorry to hear about your medical

18 condition, that you had to retire because of that.

19         You said that Dr. Sachy treated you since 2012 and also

20 treated your husband?

21    A    Yes, ma'am.

22    Q    When did he begin treating your husband?

23    A    I can't really remember.  It's probably been four or

24 five years ago.

25    Q    Okay.  So around 2013 or 2014 would be safe to

1  guesstimate?

2      A    Yes, just a guess.

3      Q    Yes, ma'am.  Are you aware that your husband has had

4  conversations with Agent Morrow --

5      A    Yes.

6      Q    -- about this investigation?  Are you aware that

7  your husband said that he never saw the need for a firearm

8  to be used in that clinic or to even be had in that clinic?

9      A    No, I'm not aware of that.

10     Q    Your husband is a Bibb County Sheriff's Officer and

11 is a respected law enforcement officer; is that correct?

12     A    Yes, ma'am.

13     Q    And has been for a number of years?

14     A    Yes, ma'am.  He's retired now.

15     Q    Yes, ma'am.  I didn't quite hear your testimony

16 about Bagley and having money or resources for DEA.  Forgive

17 me, I was writing and trying to listen at the same time but I

18 don't always do that well.

19     What was your testimony as to that issue?

20     A    My concern at the time when we were hearing rumors

21 that Dr. Sachy was under investigation I called the DEA and

22 the person I spoke with was a Mrs. Bagley in Atlanta.  She

23 assured me at the time that the DEA did not do the things that

24 we were hearing, like storm into pharmacies dressed in SWAT

25 gear and this type of thing, that they had neither the money

 1   nor the resources to conduct those kinds of raids or

 2   investigations.

 3        And my concern was that Paul would be left out in the

 4   dark and if there was an issue I needed to know about it and,

 5   in fact, that has happened.

 6        Q    So you called to personally intervene on behalf of

 7   Dr. Sachy in relations to the investigation?

 8        A    No, ma'am.  I'm trying to make sure that my husband

 9   had the care that he needed and if there was an issue I wanted

10   to know about it.

11             MS. BOOKER:  Okay.  That's all that I have, Your

12   Honor.

13             MS. HOGUE:  I have no more questions.  Thank you.

14             THE COURT:  Thank you, Dr. Logan.  May she be

15   released?

16             MS. BOOKER:  Yes, Your Honor.

17             MS. HOGUE:  My final witness, Your Honor, Kirstin

18   Key.

19             COURTROOM DEPUTY:  Do you solemnly swear that the

20   testimony you're about to give is the truth, the whole truth,

21   and nothing but the truth, so help you God?

22             THE WITNESS:  I do.

23             COURTROOM DEPUTY:  Please state and spell your name

24   for the record.

25             THE WITNESS:  Yes.  It's Kirstin K-I-R-S-T-I-N,

1   Jennifer J-E-N-N-I-F-E-R, K-E-Y.

2                      KIRSTIN JENNIFER KEY

3              Whereupon, witness having been duly sworn,

4                      testified as follows:

5                      DIRECT EXAMINATION

6   BY MS. HOGUE:

7        Q    Ms. Key, what do you do for a living?

8        A    I am a paralegal.

9        Q    Where?

10       A    At Hogue, Hogue, Fitzgerald and Griffin.

11       Q    Thank you.  Did you have a chance to conduct a

12   search at my request?

13       A    I did.

14       Q    And what was that -- we're not going to be

15   talking -- we've already confirmed that this was not a paid

16   search engine for getting the information on this exhibit.  So

17   we're not going to have to talk about that.

18       A    Right.

19       Q    But I want to talk about the thumbnail photograph --

20   the two photographs of homes that were on the government's

21   exhibit that you had an opportunity to see?

22       A    Right.

23       Q    Did you discover that there is a way to obtain

24   pictures of an individual's home out there in the public

25   domain?

1      A     I did.

2      Q     How do you do that?

3      A     I went to the Bibb County Tax Assessor's office

4  website and just searched that way.

5      Q     How do you search on the Bibb County Tax Assessor's

6  website?  Let's assume you put in Bibb County Tax Assessor's

7  website, it comes up, and what do you put in?

8      A     I believe -- let's see, I googled Bibb County Tax

9  Assessor, went to the website, and I believe I clicked on

10 property card.  It gives you a place to search a name and I

11 typed it Hogue, Frank.  And then there were several choices. I

12 clicked on Frank and Laura Hogue.

13     Q     And I've shown the government a picture of what you

14 were able to do.  Did anything come up at that point?  I want

15 to show you this exhibit for demonstrative purposes.  Did

16 anything come up when you did that?

17     A     It did.

18     Q     What came up?

19     A     A picture of Frank and Laura Hogue's house.

20     Q     And then if you turn -- does it have other

21 information about the home?

22     A     It does.  It has several pictures.  It looks like

23 there's about eight to ten pictures of the inside of the home

24 and the outside.

25     Q     I don't see anything of the inside of the home.  Can

```
1    you look on the back page?

2         A    I see --  oh, maybe that is the outside.  I see a

3    kitchen and grill.

4         Q    That's actually an outdoor grill.

5         A    An outdoor grill.  Okay.  An outdoor grill, not the

6    inside.

7         Q    That's why you thought that.

8         A    Okay.

9         Q    So those photographs -- and I will hand up to the

10   Court just for demonstrative purposes so that my home does not

11   become a matter of public record.

12             MR. HOGUE:  It already is.

13             THE COURT:  Yeah.  I'll take judicial notice I've

14   been to your home before.

15             MS. HOGUE:  All right.

16   BY MS. HOGUE:

17        Q    So, Ms. Key, all you did was go to the tax

18   assessor's website and put in our last name and all of these

19   pictures showed up?

20        A    Correct.

21             MS. HOGUE:  I have nothing further.

22             MS. BOOKER:  I have nothing.  Nice to see you Ms.

23   Key in person and not on the phone.

24             THE WITNESS:  Nice to see you.

25             THE COURT:  Ms. Key, may she be released?
```

1              MS. BOOKER:  Yes, Your Honor.

2              MS. HOGUE:  Yes, please.

3              THE COURT:  You are released.

4              MS. HOGUE:  Your Honor, I want to now move to the

5    issue concerning financial resources in terms of setting the

6    stage here for just the presentation of the last portion of my

7    evidence.

8              The Court concluded -- and I'll use your sentence --

9    in an unrelated civil proceeding, civil contempt after -- let

10   me read it here.  Defendant was held in civil contempt after

11   transferring substantial assets to a foreign jurisdiction in

12   an effort to evade court orders.

13             And in that same paragraph the Court concluded that

14   the government had presented evidence that defendant had

15   substantial financial resources, but pointed in that paragraph

16   to resources that were maintained in bank accounts that had

17   been identified and seized by the government.

18             So what I want to do, Your Honor, to orient us.

19   Your conclusion, respectfully, that Dr. Sachy was held in

20   contempt appears to come from page 26 of Officer Morrow's

21   testimony where he testified.

22                  "From what I understand the money was

23             lost at some point and" -- this is

24             probably what the Court relied upon --

25             "the Judge instructed him to produce it

1           and he failed to produce it and he was

2           arrested."

3           And it all fairness this is what Officer Morrow

4    testified from his understanding.  He wasn't there.  He didn't

5    have the proceedings in front of him.

6           So I do now have the proceedings that I want to

7    present to the Court.  So I want to mark as Defendant's

8    Exhibit -- where are we now?

9           MR. HOGUE:  7.

10          MS. HOGUE:  7.  I have the transcript from the

11   motion for contempt and motion for attorney's fees held before

12   Judge William Prior in Jones County Superior Court on January

13   28, 2010.  And I want to just point out a few sections.  I've

14   provided the prosecutor with this transcript as well.

15          And I want to point out to the Court that on page 17

16   of this transcript, during the examination -- let me get mine

17   here.  I can hand this one up to the Court.  I tender this,

18   Your Honor.

19          MS. BOOKER:  Haven't had a chance to read all 100

20   pages, Your Honor, or 99 pages, I don't know what I'm supposed

21   to do with this without having the chance to read through it.

22          MS. HOGUE:  This is the situation that we, of

23   course, found ourself in, Your Honor.

24          MS. BOOKER:  I don't think they had a hundred pages

25   of a transcript.  It was pictures, that's quite different,

1    Your Honor.

2          THE COURT:  Well, you know, this was something we

3    talked about at the hearing and so I will be interested to

4    hear more about it.  I will let Ms. Hogue continue.

5          MS. HOGUE:  In this hearing Dr. Sachy was

6    represented by an attorney named Mr. Jeffrey Barnes.  And Kice

7    Stone was representing Dr. Sachy's ex-wife.

8          And on 17 of Mr. Stone on line 19, indicates that.

9                "Your lawyer has suggested to this

10               Court -- this is in cross examining Tom

11               Sachy -- "that you have sent money to

12               Canada and you have turned that money over

13               to an investor up there; is that right?"

14         And the answer is, "Correct."

15         And on page 19 Dr. Sachy confirms that Dr. Amery, a

16   Dr. Hussein Amery, was the investment -- line number 18 --

17               "Dr. Amery was the investment

18               advisor?  To which Dr. Sachy responded,

19               "Yes."

20         And then on the next page he explains.

21               "I took it to Canada after

22               considering various investment that I

23               could make and given the unsettled and

24               unsafe nature of the banking institutions

25               here and what was going on."

1           Now I'll turn the Court's attention to page 28.  And

2    the question of Dr. Sachy was:

3                "Why did you do that?"  On line 11.

4                "Why did you do that?"  And Dr. Sachy

5                responded, "Because I felt it was

6                absolutely unsafe at the time -- at that

7                time back -- back at that time, the news

8                about Bank of America was terrible.  It

9                had lost 90 percent of its value -- its

10               stock value.  American banks were

11               collapsing left and right.  In 2009 -- in

12               early 2009 Georgia had the highest bank

13               failure rate of any state, and I have them

14               somewhere where I just looked it up the

15               other night, Forbes, Motley Fool, various

16               financial investment gurus were saying

17               that Bank of America was in trouble and it

18               was in danger."

19           On page 71 of the transcript, beginning at line 14,

20    Mr. Barnes called Hussein Amery from Calgary to confirm this

21    information.  And on page -- Mr. Hussein Amery, on page 71,

22    line 14, is called as a witness.  And on page 72 Mr. Amery is

23    asked on line 20:

24               "Did he entrust $950,000?  The answer

25               is, "Yes."

1               On line 25.  "Prior to May of -- he's asked can you

2       tell us why?

3                       "Prior to May of 2009 Tom was calling

4               me sporadically, telling me how concerned

5               he was about the financial situation in

6               America, and he wanted something --

7               thought that Canada was in better shape

8               and he wanted to explore investment

9               opportunities in Canada."

10              He then describes on line 5 of page 72, That he

11      brought up bank drafts:

12                      "One for 500,000 and one for $453,000

13              and some change."

14              On page 76, line 9, Mr. Hussein testifies that he

15      had paid -- on line 9 -- Paid the money to a Hermes Capital

16      Investment Corporation, an investment banker named Mike

17      Vlahovic of Calgary."

18              And then finally I'll -- most importantly -- the

19      fact is, Your Honor, the finding of contempt which begins on

20      page 98 of this transcript, line 21, is not for moving money.

21      It's simply for failing to pay the money that had been owed,

22      regardless of whether he still was appealing that finding that

23      he owed that much money to his ex-wife.  So I will read

24      beginning line 21 of page 98.  The court says:

25                      "I find that he's in willful contempt

1          of this Court for failure to pay a Court

2          ordered Judgment in the amount of

3          $930,000, plus interest at the legal rate,

4          and order him incarcerated until such time

5          as he may pay that judgment."

6          So I introduce that transcript to clarify and clear

7   up the record and to say this:  That I believe the Court can

8   take judicial notice, with all due respect.  An individual

9   cannot be held in contempt for doing something that he has

10  never been told that he could or could not do.  In other

11  words, in the divorce proceeding Tom Sachy was never ordered

12  not to move money, not to invest money in certain locations

13  domestic or international.  He simply was told, "You got to

14  pay this judgment" and when he didn't that's what resulted in

15  the contempt.

16         I also want to hand up to the Court -- on a search

17  done just today -- Defendant's Exhibit Number 8 which are

18  three articles concerning the financial market in the United

19  States of America in the beginning -- end of 2008 and

20  beginning of 2009.  It should practically be an issue that the

21  Court can take notice of, but those articles certainly support

22  the discomfort that Dr. Sachy testified to in having in that

23  hearing.

24         But most importantly while we have cleared up why he

25  was held in contempt we now can satisfy the Court that the

 1   availability of those funds, either domestically or

 2   internationally, is no longer a concern.

 3          I have to do a proffer with -- it's a little

 4   unusual -- but because the Court can take proffers in this

 5   sort of hearing I am now handing you -- which is what is going

 6   to seem unusual, but I'm going to clear this up -- an unsigned

 7   affidavit of Jeffrey Barnes.  Jeffrey Barnes was Dr. Sachy's

 8   attorney in that hearing.  He was in trial and we were having

 9   the hardest time -- let's remark this.  We now have the signed

10   affidavit and let me renumber that then.

11          MS. BOOKER:  This is 9?

12          MS. HOGUE:  Yes.  That will be 9.

13          So it is signed, Your Honor, but I see not notarized

14   and I will explain to the Court that we had a number of

15   communications with Mr. Barnes.  It was a very old file and we

16   were able to get the documents that's attached as Exhibit 1 to

17   Defendant's Exhibit 9.

18          And my conversations, our offices conversations with

19   Mr. Barnes, he was -- he -- we sent him the proposed language

20   for the affidavit.  He wanted to write it his way and he did.

21   He sent it back to us.  We put it in affidavit format.  We

22   e-mailed it to him and he is literally in trial right now.

23   And last night was when he had promised to try to find a

24   notary to get it notarized, but apparently did not and sent it

25   to us while I was in this hearing -- his office sent it

1    signed.

2          It does, in fact, represent -- and I state in my

3    place -- represent what he swears to about this transaction.

4    And the nature of this, Your Honor, is that Mr. Barnes is

5    confirming the letter of February 3, 2010 attached from the

6    Bank of North Georgia telling Mr. Barnes that they had

7    received, for deposit, a certified check in the amount of

8    $800,000 written on a -- it's drawn on Canada Trust.  It came

9    back from Canada.  They have to hold the funds before they can

10   put them in the IOLTA trust account before he can then be able

11   to purge Dr. Sachy of the contempt.  And that is what he

12   swears to in this affidavit, Defendant's Exhibit Number 9.

13         And then, Your Honor, to round all of this out.  I

14   will point out that the bank letter is dated February 3rd,

15   2010 following the contempt order and proceeding on January

16   28th of 2010.

17         And then we see in what I've marked as Defendant's

18   Exhibit Number 10 the consent order from Judge Prior

19   confirming the receipt of what totaled, Your Honor,

20   $1,004,804.70 which was the amount that he owed in the

21   original judgment plus all of the interest.  And on that day

22   of this consent order confirming the receipt of those funds

23   from Mr. Barnes' trust account to Mr. Stone's trust account to

24   pay off Dr. Sims is dated March 25th, 2010.  Which means,

25   Your Honor, that the money went to Canada, just as he

1    testified, because of his concern about the market here in the

2    state.  The money was returned from Canada to his attorney Mr.

3    Barnes and that money was the money used to purge him -- and

4    more -- to purge him of this contempt.  All of this happening

5    over eight years ago and that money is now cleared it up of an

6    issue, I would hope, in the Court's mind.

7              Now, we have one more proffer before we rest our

8    evidence.  Let me say this, I've tendered these.  Have they

9    been admitted?

10             MS. BOOKER:  Your Honor, 7, which is the 99 page

11   transcript -- I think Your Honor already addressed that, but

12   again, have not had a chance to read or look at this which is

13   --

14             THE COURT:  Let's take a break for about five or ten

15   minutes and let the CSO's deal with this noise on the roof.

16             CSO OFFICER:  All rise.

17   (RECESS)

18             CSO OFFICER:  All rise.  This Honorable Court is

19   again in session.

20             THE COURT:  We're back and quiet.

21             MS. HOGUE:  I know that I tendered 7, 8, 9 and 10

22   and now I would like to have them admitted.

23             MS. BOOKER:  Your Honor, I've stated about the 99

24   pages we just received of 7 and haven't had a chance to read

25   through that.  Your Honor has already heard me on that.

1          8 is 17 pages of three different online articles I

2   believe that the Court -- I have no objection to the Court

3   taking judicial notice that 2008 was a bad year financially.

4   I think everyone in the country knows that.  Not having read

5   through these 17 pages I'm not sure what's in them.  So I

6   would just refer the Court take judicial notice that 2008 was

7   a bad year financially.

8          As to Exhibit 9, the affidavit of Jeffrey Barnes.

9   It is not notarized, but it's signed and I take defense

10  counsel's word that this would have been notarized were he not

11  in trial.  So, I have no objection to that.

12         Same with 10, I have no objection to the consent

13  order, although I just got it and have briefly read through it

14  and I don't see any issue with 10.

15         THE COURT:  Well, those exhibits will all be

16  admitted.

17                      (Defendant's Exhibit 7, 8, 9 & 10

18                       admitted)

19         MR. HOGUE:  Your Honor, the final piece of defense

20  evidence I will give to the Court by proffer.

21         I know the Court is aware of various combinations of

22  conditions that can be imposed on a defendant who is released

23  pretrial.  One of these conditions is electronic monitoring

24  and I have spoken to a US Probation Officer, Donnie Allen, who

25  is here in the courtroom, to confirm -- first to find out how

 1  it's done and to confirm it.  I know the Court is familiar

 2  with it, but I want the record to be perfected on this point.

 3          The proffer is that Dr. Sachy can be fixed with a

 4  monitor.  There are two types.  There is the homing device

 5  type that has a radius from within his home and perhaps it

 6  extends -- I don't know how big the radius is -- but outside

 7  the home into the yard.  And if he was to go outside of that

 8  radius this electronic system would notify whoever is

 9  monitoring it that he has gone outside those boundaries.

10          The other type is a GPS monitor where again he is

11  affixed with a device that sends a signal, and a monitor that

12  a computer can see in realtime where he is.  Perhaps by means

13  of a dot on a map on a computer screen you can actually track

14  the movements.

15          I will state that I have had several clients placed

16  on GPS monitoring and those who monitor my clients in those

17  situations have been able to say with specificity where they

18  are at what time of the day.  And, of course, their movements

19  are monitored and permission is sought for those defendants to

20  move about.

21          So I state that those are facts that had I called

22  Officer Allen he could have testified to that.  One of his

23  colleagues, Tony Elder, is the one primarily who conducts that

24  monitoring, but that is a condition that can be imposed.

25          MS. HOGUE:  That concludes our evidence, Your Honor

1    I have a little argument.

2              THE COURT:  Does the government have any evidence to

3    present?

4              MS. BOOKER:  No additional evidence to put on as far

5    as testimony, Your Honor.

6              But I will state that the other officer whose

7    personal information was found on Dr. Sachy's hard drive is

8    present, along with Officer Ken Morrow.

9              I will proffer the fact that the DEA has had to pay

10   for some surveillance measures at their personal homes because

11   of this information that was found on Dr. Sachy's hard drive

12   and I would ask the Court to take that into consideration, as

13   well as all of the other evidence that I admitted from his

14   hard drive.

15             THE COURT:  Ms. Hogue, let me hear your argument.

16             MS. HOGUE:  Thank you, Your Honor.

17             I ask the Court, in reviewing all of the evidence

18   that we have presented today, to also keep it mind Exhibits 1

19   through 10 that were presented at the first motion hearing.

20   And that is this, Your Honor, we have a 54-year old physician

21   who is just a little shy of four and a half months post back

22   surgery.  A back surgery obviously being a situation that is

23   not amenable to the harsh conditions in a jail setting.

24             But most of those exhibits from the first hearing

25   went to Dr. Sachy's medical background.  You don't become a

1    doctor overnight.  You don't become a doctor for any reason

2    other than the desire to help people.  And Dr. Sachy worked

3    for years and years through undergrad, graduate school,

4    medical school and additional specialization through

5    internships and residencies in order to be the best physician

6    that he could be.  But most significantly what that represents

7    is that he is a responsible, law abiding, industrious,

8    individual who can follow all the rules and regulations not

9    only of a complex and complicated field of study, but to

10   follow all the rules and regulations imposed on him by the

11   medical board and any other specific practice areas that he's

12   been involved in.

13           The Court -- we ask to keep in mind, the charges

14   that we are addressing here with respect to bail.  This is a

15   case that will come down to a clash of experts.  This is not a

16   situation where Dr. Sachy is being charged with a violent

17   crime and then the government is presenting evidence of

18   further alleged violent acts that help the Court get over the

19   hump, which is the presumption of bond.

20           This is a case where a medical practitioner for whom

21   scores of people came to get treatment and I expect and can

22   state for you that there are plenty of patients who are

23   reaching out to the defense side in angst over the loss of his

24   treatment, his care, his empathy, his creativity and his

25   energy in their treatment.

1          So what it's going to come down to, Your Honor, is

2     one set of experts saying this combination of medication and

3     these dosages is too much and another set of experts, I

4     expect, saying we disagree.  And the jury will have to decide

5     if that disagreement rises to the level of a crime.

6          Another important factor that goes towards the

7     question of bond is how long would this detention order

8     require Dr. Sachy to stay in custody?  This will, no doubt, be

9     declared a complex case.  I have been involved in no pain

10    management clinic cases that were not declared complex, and

11    that has necessarily meant for us delays of 18 to 24 months

12    before trial -- as much as that amount of time.  And there is

13    no way to slice it other than saying Dr. Sachy will be

14    punished for two years until he gets his day in court.

15          There was no evidence, Your Honor, that Dr. Sachy

16    has done one thing to act in a way that the government is

17    asking you to infer, he intended to act as a result of

18    collecting those photographs.  There are numerous things that

19    any individual could have done to harass, intimidate, harm,

20    frighten, make somebody squeamish, if he had chosen to do

21    that.  And there was all sorts of things that we can each --

22    we can each come up with a laundry list of things that

23    Dr. Sachy could have done in all the months he knew that the

24    DEA was speaking poorly about him to pharmacists and

25    contacting his patients and calling him a quack.  But he did

1   no such thing, Your Honor, in all of those months, except get

2   a lawyer to write to these individuals to say, I want you to

3   come here and talk to me.  I want us to discuss this.  I want

4   to be able to tell you why I prescribed the way I prescribed

5   and I want to hear what you have to say in a legitimate,

6   reasonable, rationale way.  Not calling me names, but hear

7   what you have to say.  But despite that angst, he did nothing

8   but gather these photographs that are available on any public

9   source.  I could do it right now in this courtroom.

10          As a result of that, Your Honor, because the

11   witnesses who testified today, who were familiar with his

12   gathering of these photographs, were able to tell you that in

13   no way, shape or form did Dr. Sachy even hint at what he could

14   do to get at these guys who were getting to him.

15          He was using them as a tool to see who was looking

16   at him and who was talking so poorly about him to these

17   patients and to these pharmacists.

18          It was, as well as we heard one of the witnesses

19   say, it was exactly as we put in the motion for

20   reconsideration.  He was incredulous that these crack

21   investigators had this information so readily available to him

22   on public record sites with the click of a button.   But had

23   he gathered that information for anything other than curiosity

24   and the ability to be incredulous we would know about it, Your

25   Honor.  We had plenty of time to have known about it.

1          I respect the agents discomfort over finding that.

2     They found it though because they conducted a search and they

3     went into his private stuff.  Had that not happened or if he

4     wanted them to know, "Hey, look what I've got on you" he would

5     have disseminated that to them in some show of force, in some

6     show of intimidation or harassment, but he did no such thing.

7          I submit to you, Your Honor, that there are no

8     financial resources out there for him to be a flight risk.  We

9     now know where it went and how it came back and where it all

10    is.  And that the government has seized and frozen the

11    remainder of his accounts.

12         So I ask the Court to comply with 3142 by finding

13    that there is a condition or combination of conditions that

14    will assure this Court and this community and these officers

15    that Dr. Sachy will pose no risk to any witnesses in this case

16    and he will be here in court whenever he is asked to be.  And

17    those conditions and combinations of conditions are ones that

18    we proffer to you, Your Honor.

19         You can place a limitation on his movement.  The

20    officers, as you see in these exhibits, do not live in this

21    area.  They live in the Fayetteville area as proffered by the

22    government in the profiles that were tendered by the

23    government.

24         Dr. Sachy lives Jones County.  His lawyers work in

25    Bibb County.  You can limit his travel to those two counties

1    and these two folks will never cross paths.  And you can

2    assure those limitations by use of a GPS monitoring system, an

3    electronic monitor that monitors his whereabouts.

4            And, in addition, if you wish to limit his ability

5    to have anything to do with patients any further all the Court

6    needs to do is to order that and Dr. Sachy will not practice

7    medicine during the pendency of this case.

8            That, Your Honor, I submit is a way of complying

9    with our presumption that Dr. Sachy is innocent and he gets

10   the right to not live in confinement and be imprisoned while

11   we get to the place where we're able to argue that before a

12   jury.  Thank you.

13           MS. BOOKER:  Your Honor, I'll renew my position that

14   was stated at the beginning of this hearing and at the end of

15   the last hearing:  That there are no conditions that would

16   assure the safety of the community and that Dr. Sachy would

17   not be a flight risk.  As Mr. Peeler said in the last hearing

18   there is absolutely no room for error in regards to this case.

19           I would like to point out a few things that have to

20   deal with Dr. Sachy's financial resources.  If, Your Honor,

21   will recall Agent Morrow said that they found 12 separate

22   accounts.  Ms. Hogue just spoke about the fact that all of

23   those were seized and are frozen and he no longer has access

24   to those accounts, pending the outcome of the case.  However,

25   Agent Morrow also testified at the original hearing they are

1   not sure if they found all of the money.  We even tendered an

2   exhibit where he said he had a letter written out where he

3   said, "Do not tell him about X. X. X. account.  Whatever you

4   do, do not tell about this account."  That's evidence that he

5   was planning for a day such as this and to have access to

6   money if and when law enforcement seized those assets.

7           In regards to the civil contempt order on page 98 of

8   Defendant's Exhibit 7, Judge Prior did say that he finds that

9   Dr. Sachy is in willful contempt of this Court for failure to

10  pay a court order.

11          But what Ms. Hogue failed to mention was that

12  beginning on page 7, the reasoning behind that finding.  Judge

13  Prior states, page 98, line 7.

14              "It is absolutely incredible to me

15              that this -- that Dr. Sachy is a medical

16              doctor, highly educated, doesn't know

17              where nine hundred and forty-three or

18              fifty-three thousand dollars is.  That's

19              incredible to me.  It's incredible to me

20              that a man that's earning -- grossing

21              $450,000 or thereabouts a year can't keep

22              up with what's going in and coming out.

23              It's incredible to me that he hasn't made

24              any effort -- any effort whatsoever to

25              comply with a Judgment of this Court that

1          is now thirteen months old.  I have bent

2          over backwards to be fair and patient with

3          Dr. Sachy.  I am now out of patience."

4          And that is the end of the quote and you go on to

5    line 20.  Dr. Sachy had 13 months to comply with the Court

6    order.  He failed to do so.  Defendant's Exhibits 9 and 10

7    simply show that after the Court order was entered, after he

8    was held in contempt, after he had 13 months to abide by a

9    Judge's ruling, he decided within the span of two months that

10   he knew where that money was and where to get it and how to

11   transfer it over.

12          This does nothing to militate against the

13   government's argument that he is a flight risk, he will not

14   obey the Court's orders and that there are no conditions that

15   will reasonably assure the safety of the community.

16          Your Honor, a lot has been made about the violent

17   depictions that were found on Dr. Sachy's hard drive and the

18   fact that he isn't necessarily charged with a violent crime,

19   but I would argue against that, Your Honor.

20          This is a rebuttable presumption case.  In Counts II

21   and III of the indictment charge Dr. Sachy with the unlawful

22   distribution and dispensation of controlled substances that

23   resulted in death or serious bodily injury of two patients.

24          And I would note for the Court that the family

25   members of those deceased patients, that we allege Dr. Sachy

1   killed with his unlawful prescribing habits, are present in

2   the court today.

3        The length of detention should not be a factor today

4   at his initial detention hearing, or the continuation of his

5   initial detention hearing.  That again, just like the rest of

6   this evidence that we have brought today, should be a

7   consideration at a further date for the district court.

8        There is an avenue and a remedy for if this case

9   drags on too long and we are unfairly prejudicing Dr. Sachy by

10  keeping him in custody for 18 months to two years, as the

11  defense deposits, that they can make a motion and argue before

12  Your Honor or the District Court that he should be let out

13  because this process is dragging too long.  We are not there

14  today, Your Honor.  This is the beginning of the case.

15       There is also insinuations that the DEA, who is

16  charged with investigating distribution of controlled

17  substances including the pharmacies and doctors who are

18  lawfully allowed to prescribed and hand out those controlled

19  substances, were running around calling Dr. Sachy a quack.

20  None of that was ever testified to or brought out in any of

21  the proceedings, whether it was today or at the July 2nd

22  hearing.  And so I don't think that Your Honor should take

23  that into consideration.

24       I also point to page 27 of the transcript of Agent

25  Morrow's testimony, from the first hearing, about whether or

1    not Dr. Sachy took any aggressive actions toward the

2    investigating agents.

3              I asked Agent Morrow about letters that were sent to

4    him and what, if anything, those letters said.  Ken Morrow

5    said they were basically threatening us or me to stop the

6    investigation or alter the investigation or they are going to

7    come after us legally.  One of the letters called us jack

8    booted storm troopers.  That does not sound like an invitation

9    to sit down.  That does not sound like an invitation for the

10   DEA agents to come by and talk with Dr. Sachy about what he's

11   doing wrong.

12             Dr. Sachy was telling them exactly what to do in

13   terms of their investigation.  To shove it.  To stop it or

14   else I'm going to come after you in court.  I know you're

15   doing your jobs. I know that DEA is mandated to do this, to

16   check in with pharmacies annually, to check in on your

17   prescribing habits.  But, no, you guys are jack booted storm

18   troopers or better yet thugs as I have labeled you in my

19   private hard drive.

20             The photos that were found on Dr. Sachy's hard

21   drive -- so what if they are available on Facebook or by some

22   free public access site.  It's one thing to go look at public

23   information, it's a separate thing to look at that

24   information -- let's back up.  Let's think about all the steps

25   that Dr. Sachy had to go through to get this on his hard

1   drive.  He had to become made aware of the investigating

2   agents.  He had to decide to go search for information on

3   these agents.  He had to decide to go outside of the agents

4   and look for information on their families, their wives,

5   children and grandchildren, their personal homes -- not their

6   place of business where he sent those letters.  And after he

7   found that information he had to decide, you know what, I'm

8   going to save this.  I'm going to download it and I'm going to

9   secure it on my personal hard drive.  This information wasn't

10   found in an Internet browser cache.  It wasn't leftover

11   material from innocent or benign browsing.  This was

12   intentional.  He named those files thugs.  He named these

13   people's wives and family members.  He had the full name of

14   Agent Vickery's wife.  He had the full name and contact

15   information of Ken Morrow's wife.  They are not investigating

16   this case.  He had five pages, as Government's Exhibit 5

17   shows, of children who have absolutely nothing to do with the

18   investigation of this case and whether or not Dr. Sachy had a

19   benign reason for having these.  There's no logical or

20   reasonable explanation for him having these in relation to

21   just being curious about who was investigating him.

22          Let's be serious, Your Honor.  There is no room for

23   error in this case and nothing that the defense has presented

24   today or on July 2nd should cause Your Honor to reconsider

25   the sound decision that you made on July 2nd that Dr. Sachy

1    is a danger to the community, specifically to the agents that

2    are investigating this case and to others, including the

3    patients that we allege that he has caused to become addicted

4    and/or die, and that there are no conditions that will

5    reasonably assure the safety of the community.  And I beg Your

6    Honor to uphold your ruling and allow Dr. Sachy to remain in

7    confinement until the trial of this case.

8              THE COURT:  Ms. Hogue?

9              MS. HOGUE:  Briefly, Your Honor.

10             We need to be clear about trying to characterize the

11   letter that a former lawyer, Johnny Pannell wrote to --

12   directly to this Agent at his workplace in November of 2017.

13             And I point to the transcript of Officer Morrow's

14   testimony, page 38, beginning on line 17, during the cross

15   examination where Officer Morrow acknowledged:  Yes, these

16   were letters that came from his lawyer Johnny Pannell.

17             And Mr. Hogue asked Officer Morrow, You characterize

18   these letters as threatening, but then you qualified that to

19   say threatening civil action.  They were not threatening any

20   violence against you, were they? And the answer was, "No, not

21   specifically."

22             So then Mr. Hogue went into the letters.  And

23   beginning on page 39, line 11, he read what Mr. Pannell wrote

24   on behalf of Dr. Sachy.

25                  "And Dr. Sachy maintains good medical

1          records, and he documents everything that

2          he believes is relevant.  As such it was

3          offered for your agency to come to his

4          practice and/or request any documents for

5          you and your agency to review.  However, I

6          received no reply whatsoever from anyone

7          in regard to my letter."

8          Officer Morrow acknowledged, yes, that sounds

9   familiar.  And Mr. Hogue asked:

10          "You didn't go over there, did you?"

11          And Officer Morrow said, "No, we do not."

12          "That's not how you work?"

13          "During a criminal investigation, no, sir,

14          that's not how we work."

15          That is the sum and substance of the contact from

16   Dr. Sachy's lawyer at the time and any characterization that

17   lawyer may have made is that lawyer's alone to Officer Morrow

18   in a letter addressed to his office.

19          THE COURT:  Well, I convened this hearing over the

20   government's objection, as we discussed earlier, primarily

21   because I always like to have more information rather then

22   less.  So I definitely was willing to get as much information

23   about this issue as I could.  And we did flesh things out a

24   lot here today although honestly most everything that I heard

25   today really was more or less an expansion or a more formal

1    presentation of information that was already -- that we

2    discussed in the previous hearing.

3            I tried to take careful notes whenever I picked up

4    on something that was new and the primary things that I picked

5    up on that were new here today were particularly some of the

6    pictures of the office, which expanded a little bit on Agent

7    Morrow's testimony about -- the one picture in particular, the

8    picture of the reception area, to give me a visual

9    representation of the testimony that I heard.

10           The testimony from Agent Morrow that the identifying

11   information that was found on the hard drive was -- actually

12   seems to have been located from an open-source, not a paid

13   service.  That is from a people finder rather than Spokeo

14   service.

15           Of course, I got these pictures that were not

16   admitted into evidence from the hard drive, particularly the

17   pictures of those little children that were identified as

18   Agent Vickery's grandchildren.

19           Of course the gruesome pictures -- I really don't

20   want to make a huge issue out of that.  They are what they

21   are.  I don't like looking at that kind of stuff, but I'm not

22   particularly drawing any inferences from that.  A lot of

23   people are interested in gross stuff like that in this

24   country.

25           And then finally the more specific information about

1   the contempt order in 2010.  Again, doesn't really -- nothing

2   changes that except a little more detail.  I thought it is

3   interesting to get the timeline a little more straight.

4          My understanding from looking through that document

5   and skimming some of the testimony that Judge George in Jones

6   County entered an order, a judgment, in the about $935,000 in

7   December of 2008.  It was in May of 2009 that Dr. Sachy had

8   the sudden -- that was a bad time, I remember losing a lot of

9   money -- well, things were turning around by May, but March

10  was the bottom.  But I know it was a bad time, but here we are

11  a few months later, he decides that Canadian banks are safer

12  and he has $943,000 to send to those banks, not even to a

13  bank, to some Hermes Capital Investment Company with

14  Dr. Amery.  That doesn't change my understanding of that

15  situation at all.

16         And, of course, I made fairly detailed remarks when

17  we were here previously outlining the reasons for my decision

18  and discussing all of those issues.  I don't see anything here

19  today that changes the analysis that I entered into the record

20  at that hearing and, therefore, I don't see any reason to

21  reconsider the decision that I have made.

22         So I am going to deny the motion for reconsideration

23  and the order of detention that I have already entered will

24  still be in effect.

25         I'm not going to enter -- well, I may do a brief

```
 1   written order just to get that off the docket.  I think what

 2   I've already got on the record I just don't want to restate

 3   what I have already stated.  I was careful to state that in as

 4   much detail as I could so that you all would have a record and

 5   now we have a more expanded record if you want to take it to

 6   the next level.

 7            So that will be the order of the Court.  Are there

 8   any other matters we need to discuss here today?

 9            MS. BOOKER:  Not at this time from the government,

10   Your Honor.

11            MS. HOGUE:  Nothing from the defense, Your Honor.

12            THE COURT:  Y'all may -- before you leave, the

13   attorneys may want to confer with the courtroom deputy and

14   make sure all the proper exhibits are in the right place.  I

15   do want to make sure that the redacted copies of those more

16   sensitive exhibits are the ones that are entered into the

17   record.  The unredacted copies I would prefer for the lawyers

18   to keep.

19            MS. BOOKER:  Yes, Your Honor.

20            THE COURT:  Without those going into the record.

21   All right. We'll be adjourned for the day.

22            CSO OFFICER:  All rise.  Court is adjourned.

23

24                    (Proceedings concluded at 12:16 p.m.)

25                         END OF RECORD
```

1               CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Tammy W. DiRocco, Federal Official Court Reporter,

4     in and for the United States District Court for the Middle

5     District of Georgia, do hereby certify that pursuant to

6     Section 753, Title 28, United States Code, that the foregoing

7     is a true and correct transcript of the stenographically

8     reported proceedings held in the above-entitled matter and

9     that the transcript page format is in conformance with the

10    regulations of the Judicial Conference of the United States.

11

12                         Dated this 23rd day of August, 2018

13

14                         *Tammy W. DiRocco*

15    _____
                              Tammy W. DiRocco CCR
16                            Federal Official Court Reporter

17

18

19

20

21

22

23

24

25